MANSFIELD, Justice.
This case requires us to determine whether a parent’s status as a methamphetamine addict, without more, is enough to support a juvenile court’s determination that the parent is “imminently likely to abuse or neglect the child,” where “abuse or neglect” means “physical injury suffered by a child as a result of the acts or omissions of the child’s parent.” See Iowa Code § 232.2(6X6), (42) (2013). We have no difficulty concluding under a separate statutory provision that a parent’s methamphetamine addiction by itself can result in “harmful effects” to the child, thereby justifying state intervention to protect the child. See id. § 232.2(6)(c )(2). However, the present appeal concerns imminent likelihood of physical injury. Because we conclude that the parent’s addiction by itself is not sufficient to establish such a likelihood of injury, we affirm the decision of the court of appeals and reverse in part the order of the juvenile court.
I. Background Facts and Proceedings.
Ashley is the mother of nine-year-old N.S. and five-year-old J.S. On April 2, 2013, the Iowa Department of Human Services (DHS) received information that Ash *38 ley was “using methamphetamines intravenously while caring for her daughters.” That day, a DHS child protection worker met Ashley at her apartment in Sioux City.
The worker found the residence clean and appropriately furnished. Ashley appeared to be very nurturing with the daughter, J.S., who was present. During the interview, Ashley explained she had recently moved to Iowa from Nebraska. J.S. was living with Ashley, but N.S. was staying with Ashley’s mother in order to attend school in South Sioux City, Nebraska. Ashley reported that she previously had a job at a retail store, but acknowledged that after she and J.S. became ill, she was fired for missing too much work.
Ashley admitted past methamphetamine use. According to Ashley, she used methamphetamine before N.S. was born. Afterward, she claims she did not use the drug for seven years. In 2012, she relapsed. Ashley admitted that Nebraska authorities had removed her children from her care due to her methamphetamine usage. After she successfully completed the Women and Children’s Center program with the children, they were returned to her. She completed the program in September 2012.
Ashley further admitted that she deteriorated again in March 2013. According to Ashley, she used methamphetamine over a weekend while spending time -with people she should not have been around. Ashley told the DHS worker that N.S. and J.S., however, were with their grandmother at the time, and Ashley claimed not to have used methamphetamine around N.S. and J.S. Ashley also said that when she did use methamphetamine, she did so by smoking it, not injecting it.
Despite phone calls and attempted visits to Ashley’s apartment in the following weeks, DHS workers were unable to meet with Ashley again until May 21. On that date, Ashley came to the DHS office at DHS’s insistence and met with DHS staff. Ashley explained that she had been staying with her boyfriend in South Dakota for about a month and that she was without her cell phone or a car. She said that both daughters were staying with her mother and stepfather. Ashley expressed a desire that they remain with her mother and stepfather, who would “take good care of the children.” She expressed concern about her children “going through this again,” and said she was worried about N.S., who had a lot of anxiety.
During the interview, Ashley acknowledged she had used methamphetamine as recently as a week ago. The child protection worker also observed emotional displays by Ashley. Ashley was angry, laughing, or crying at times throughout the interview. The worker noted she was “not sure what to attribute this to, her usage or an emotional reaction to the situation.” Ashley consented to a drug test which came back positive for methamphetamine, amphetamine, cannabinoids, and carboxy-THC.[1] Staff members who administered the drug test suspected Ashley was under the influence at the time of the test because “she appeared extremely scattered.”
The next day, the DHS child protection worker met with N.S., J.S., and their maternal grandmother at the grandmother’s *39 home in South Sioux City. The home was spacious, clean, and appropriately furnished. N.S. and J.S. were neatly groomed and in clean clothes. The grandmother expressed significant concern about Ashley’s ongoing drug use. She explained that when she is at her part-time job, she puts the children in day care.
On June 14, the child protection worker spoke with Ashley over the telephone. Ashley explained she had visited the children at their grandmother’s home, with their grandmother supervising the visits. Ashley said their grandmother had offered to become N.S. and J.S.’s guardian, but Ashley was willing to do whatever was necessary to get N.S. and J.S. back in her care. Toward that end, Ashley claimed to have changed her phone number and severed some relationships. She also conveyed her willingness to go to inpatient treatment if recommended.
The DHS worker concluded there was “sufficient credible evidence to indicate that Denial of Critical Care, specifically Failure to Provide Proper Supervision[,] has occurred.” In support of this finding, the child protection worker noted:
Even if [Ashley] was not caring for [N.S. and J.S.] at the time of her use, risk exists in caring for a child when coming down from methamphetamines.
Parents who are addicted to metham-phetamines are not available to their children because under the influence of meth there is an initial high that an individual perceives and very soon after that high comes a downfall or depression, which is very much more severe with methamphetamine than other drugs of abuse. When that happens many meth using adults will fall asleep, and that period can last for hours at a time. In that period of time, they’re not capable of providing supervision and care for young children around the household.
Methamphetamine is also a drug that stimulates the sensory nerve system and it also blocks the higher centers that are responsible for the checks and balances of impulses. Perceptions of danger and reasoning ability are hindered from ongoing meth use, so that over a period of time an adult using methamphetamine loses (his/her) capacity to function on a daily basis because of a lack of comprehension of what the risks [are] in the environment, what the children’s needs [are] on a day-to-day basis because they don’t have the energy level to provide for those needs. And also, because of the poor impulse control and increased risk of losing their temper and anger, the children in an environment where parents use meth are at an increased risk of physical abuse.
As later noted by the court of appeals, this passage is almost a direct quotation from our opinion in State v. Petithory, 702 N.W.2d 854, 857-58 (Iowa 2005). There we were quoting an expert witness’s testimony in Petithory’s criminal trial. See id.
The DHS report also concluded that it was “certainly not reasonable nor prudent [for Ashley] to use illegal drugs, given the fact that she is the primary caretaker of her children.”
In early July, Ashley completed an evaluation at a recovery center and began intensive outpatient drug treatment. In a meeting with DHS on July 9, Ashley stated she did not want to go through the Women and Children’s Center program again, because it was “very hard on the children.” She admitted she had been hanging around with the wrong crowd again.
In mid-July, Ashley relapsed. A report dated August 22 indicated Ashley had “made little to no progress in the last 30 *40 days” and had tested positive for methamphetamine, amphetamine, and opiates. Ashley denied using opiates. Ashley had attended only eight of the twenty-six days scheduled for group sessions and still needed to have an individual session to “create her treatment plan.” The discharge plan noted she was “recommended for inpatient treatment ... followed by halfway house placement,” and further recommended she continue with services for eight to twelve months. On August 27, Ashley was admitted to a residential drug treatment program.
The State filed a petition on July 31 alleging N.S. and J.S. were children in need of assistance (CINA) under Iowa Code sections 232.2(6)(a), (b), (c )(2), and (n)[2] On August 30, the juvenile court held a hearing. Ashley resisted adjudication under Iowa Code sections 232.2(6)(6) and (n). The parties waived a formal record. No witnesses were called. Ashley did not object to admission of the State’s nine exhibits, and no other evidence was presented.
On September 5, the juvenile court filed an order adjudicating N.S. and J.S. CINA under Iowa Code sections 232.2(6)(a), (b), and (c )(2). The juvenile court declined to adjudicate the children under Iowa Code section 232.2(6)(⅞).
On September 30, a dispositional hearing was held. The parties again waived a formal record, no testimony was heard, and with the exception of two additional exhibits submitted by the State, no new evidence was presented. The court ordered that N.S. and J.S. be placed with their maternal grandmother.
Ashley filed a notice of appeal on October 11. Ashley challenged only the CINA determination under Iowa Code section 232.2(6)(6). We transferred the case to the court of appeals. The court of appeals reversed, with one judge dissenting. It held the State failed to meet its burden of proving N.S. and J.S. should be adjudicated CINA under Iowa Code section 232.2(6)(6). The State sought further review, which we granted.
II. Standard of Review.
We review CINA proceedings de novo. In re K.B., 753 N.W.2d 14, 15 (Iowa 2008). In reviewing the proceedings, we are not bound by the juvenile court’s fact findings; however, we do give them weight. In re K.N., 625 N.W.2d 731, 733 (Iowa 2001) (en banc).[3] Our primary concern is the children’s best interests. Id. *41 CINA determinations must be based upon clear and convincing evidence. Iowa Code § 232.96(2).
III. Discussion.
Ashley raises only one issue on appeal: Did the juvenile court correctly find that N.S. and J.S. are children in need of assistance under Iowa Code section 232.2(6)(6)? Although Ashley does not contest the CINA determination under section 232.2(6)(c )(2), that does not render the present appeal moot. The grounds for a CINA adjudication do matter. See In re L.G., 532 N.W.2d 478, 480 (Iowa Ct.App.1995) (“The underlying grounds of adjudication in child in need of assistance cases have important legal implications beyond the adjudication.”). For example, a CINA determination under section 232.2(6)(6) may lead to termination of parental rights under section 232.116(l)(d), whereas a CINA determination under section 232.2(6)(c )(2) cannot. See Iowa Code §§ 232.2(6)(6), 232.2(6)(c )(2), 232.116(l)(d). In other words, adjudication under section 232.2(6)(6) may result in parental rights being terminated before the statutory time periods in sections 232.116(l)(e), 232.116(l)(/‘), or 232.116(1)(⅛) have passed. See In re J.E., 723 N.W.2d 793, 801-02 (Iowa 2006) (Cady, J., concurring specially) (discussing the importance of statutory deadlines for reunification).
Under Iowa Code section 232.2(6)(6), the CINA adjudication requires a determination that a “parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.” But “physical abuse or neglect” and “abuse or neglect” are terms of art in this context. Within chapter 232, “physical abuse or neglect” and “abuse or neglect” mean “any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child’s parent, guardian, or custodian or other person legally responsible for the child.” Id. § 232.2(42).[4]
We have explained “physical injury to the child is a prerequisite” to finding past physical abuse or neglect. See In re B.B., 440 N.W.2d 594, 597 (Iowa 1989) (observing the definition of neglect under chapter 232 requires a finding of physical injury). Nothing in the record indicates N.S. or J.S. suffered a physical injury. Therefore, N.S. and J.S. cannot be adjudicated CINA under section 232.2(6)(6) based on previous abuse or neglect, and the State concedes as much.
The only issue, therefore, is whether the record demonstrates by clear and convincing evidence that N.S. or J.S. were “imminently likely” to suffer a nonacci-dental physical injury. Here we agree with the views of the court of appeals. True, Ashley’s admitted methamphetamine use, her repeated positive drug tests, and her relapses indicate she is an active methamphetamine addict. Furthermore, the record establishes that the children have suffered or are imminently likely to suffer “harmful effects” as a result of Ashley’s failure to exercise a reasonable degree of care in supervising them. See Iowa Code § 232.2(6)(c )(2).
Although chapter 232 does not contain a definition of “harmful effects,” we have noted it “pertains to the physical, mental or social welfare of a child.” In re Wall, 295 N.W.2d 455, 458 (Iowa 1980). Because of this broad definition, we have found *42 such effects established when there was harm to a child’s physical, mental, or social well-being or such harm was imminently likely to occur. See In re B.B., 440 N.W.2d at 597-98 (finding the State proved the parents’ failure to exercise a reasonable degree of care when a child’s lack of attendance at school “adversely affected his educational, social, and emotional development”); In re J.S., 427 N.W.2d 162, 165 (Iowa 1988) (finding harmful effects as a result of a failure to exercise a reasonable degree of care in supervising children given that a child was playing outside on the street while the parents’ home was locked and a child was “very aggressive and uncontrollable”). Hence, a juvenile court could reasonably determine that a parent’s active addiction to methamphetamine is “imminently likely” to result in harmful effects to the physical, mental, or social wellbeing of the children in the parent’s care. See In re A.B., 815 N.W.2d 764, 776 (Iowa 2012) (noting “an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children”).
It is telling that Ashley’s own mother was so concerned about the effects of Ashley’s drug addiction that she felt it necessary to personally supervise Ashley’s visits to her own children. Ashley admitted the consequences of her methamphetamine addiction were hard on the children. Being shuttled back and forth from grandparents during episodes of drug intoxication, or when Ashley decided to stay with her boyfriend in South Dakota for a month, is disruptive to a child’s emotional health and well-being. Clearly, the section 232.2(6)(c )(2) determination was appropriate here.
Having said all that, we do not believe general statements about methamphetamine addiction are enough by themselves to prove that a child is imminently likely to suffer physical harm under section 232.2(6)((>). See Iowa Code § 232.2(6)(6), (42). In this case, from what we can tell on this record, a grandparent was willing and able to step in and relieve Ashley of parenting duties when she was not up to the task. As a result, the children were well-groomed, well-dressed, well-fed, and generally well-cared for while at their grandmother’s. To some extent, what happened here is analogous to what occurs when a parent falls ill or becomes disabled and leaves her or his children with a relative. We would rather have parents who are grappling with untreated addiction rely on the services of a relative than do nothing, and so it seems unfair not to take that into consideration at all.
We can contrast this case with Petithory, where the defendant had no parental surrogate. See 702 N.W.2d at 855. In that case, while coming down from a methamphetamine high, the defendant fell asleep after putting his infant daughter in the bathtub with the water running, an episode that resulted in his daughter’s drowning. Id. It is possible that N.S. and J.S. may have been exposed to similar dangers, notwithstanding the availability of Ashley’s mother, but a general statement about methamphetamine’s deleterious effects is not enough to meet the State’s burden. Indeed, in Petithory we stressed that the conviction for criminal neglect was not based “purely upon [the defendant’s] status as an illegal drug user” and that “[t]he particular circumstances of this case, buttressed by expert testimony regarding the [e]ffects of meth addiction and its concomitant dangers,” supported the finding of guilt. Id. at 859-60.
Although the phrase “imminently likely” is used three times in the definition of “child in need of assistance,” the term “imminent” is not defined in Iowa Code *43 chapter 232. See Iowa Code § 232.2(6)(6 )-(d). When the legislature leaves a term undefined, we may look to this court’s decisions, other courts’ decisions, dictionary definitions, similar statutes, and common usage to define the term. Schaefer v. Putnam, 841 N.W.2d 68, 78 (Iowa 2013). Relying on a dictionary definition, we have defined “imminent” for purposes of our self-defense statute to mean “ ‘ready to take place,’ ‘near at hand,’ ‘hanging threateningly over one’s head,’ and ‘menacingly near.’ ” State v. Shanahan, 712 N.W.2d 121, 142 (Iowa 2006) (citing Webster’s Third New International Dictionary 1130 (unabr. ed.2002)). Relying on this same definition, we explained in another case that “imminent” means a threatened act “is impending or about to occur.” State v. Lane, 743 N.W.2d 178, 182 (Iowa 2007). “Imminent” has also been defined to mean “on the point of happening.” Black’s Law Dictionary 750 (6th ed.1990).
Case law supports a liberal interpretation of the phrase “imminently likely” in the CINA context. In In re D.D., an eight-year-old boy was adjudicated a child in need of assistance under Iowa Code section 232.2(6)(d) because the juvenile court found he was “ ‘imminently likely to be sexually abused’ by his father.” 653 N.W.2d 359, 361-62 (Iowa 2002). The father had admitted climbing into the bathtub and encouraging his nude ten-year-old daughter and her female friend “to soap his chest and stomach and then slide down his body.” Id. at 360-61. The boy denied his father had ever bathed with him or touched him. Id. at 360. Nevertheless, because of the incident with the two girls and the boy’s vulnerability to sexual abuse, this court found the boy to be in imminent danger of sexual abuse. See id. at 362.
In another case, we upheld an adjudication of a child as one in need of assistance because we found the child “imminently likely to be abused or neglected by her mother or maternal grandparents.” In re A.M.H., 516 N.W.2d 867, 872 (Iowa 1994). The grandparents had been involved in numerous instances of physical and sexual abuse with others. See id. at 873. The mother had been convicted of assault and had been hospitalized because she threatened to harm herself. See id. at 873-74. She also failed to cooperate with mental health treatment and failed to pursue Title XIX coverage despite being urged to do so by a social worker. See id. at 874. Finally, the mother was an admitted alcoholic and drug addict. Id. We concluded the child could not be safely parented by either the mother or the grandparents. Id.
D.D. and A.M.H. establish that under Iowa Code section 232.2(6), we do not require neglect or physical or sexual abuse to be on the verge of happening before adjudicating a child as one in need of assistance. Nor should we require that showing. Child protection statutes “are designed to prevent probable harm to the child and do not require delay until after harm has occurred.” In re L.L., 459 N.W.2d 489, 494 (Iowa 1990).
Even so, in both D.D. and A.M.H. there were specific prior instances of sexual or physical abuse committed by a caregiver. In D.D., the father’s previous sexual contact with his daughter and her friend put his son at risk of future sexual abuse. See 653 N.W.2d at 362. In A.M.H., several founded sexual and physical abuse reports against the grandparents contributed to the risk of future abuse of the child. See 516 N.W.2d at 873-74. Unlike in those cases, here the State failed to prove any specific prior incidents of abuse or neglect. Its case was based on the general characteristics of methamphetamine addiction, and for section 232.2(6)(6) purposes, we do not believe that is automatically enough to *44 establish an imminent likelihood of physical harm to the children.
IV. Conclusion.
For the foregoing reasons, we reverse the order of the juvenile court finding N.S. and J.S. to be children in need of assistance under Iowa Code section 232.2(6)(6 ). We affirm the juvenile court’s order in all other respects. We affirm the decision of the court of appeals.
DECISION OF COURT OF APPEALS AFFIRMED; JUVENILE COURT ORDER AFFIRMED IN PART AND REVERSED IN PART.
All justices concur except CADY, C.J., and ZAGER, J., who dissent.

. The State argues for the first time on appeal that Ashley’s test results were consistent with daily methamphetamine use, citing expert testimony in an unpublished Texas appellate case and a commercial website known as www.testcountry.com. These sources cannot be used to fill in gaps in the State’s proof below. We do agree the record demonstrates that Ashley was an active methamphetamine addict who was in need of treatment at the time of the CINA proceeding.

. Section 232.2(6)(a) involves a child ‘‘[w]hose parent, guardian, or other custodian has abandoned or deserted the child.” Iowa Code § 232.2(6)(a).
Section 232.2(6)(&) involves a child "[wjhose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.” Iowa Code § 232.2(6)(⅛).
Section 232.2(6)(c )(2) involves a child
[w]ho has suffered or is imminently likely to suffer harmful effects as a result of ... [t]he failure of the child’s parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.
Iowa Code § 232.2(6)(c )(2).
Section 232.2(6)(n) involves a child "[wjhose parent’s or guardian’s mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care.” Iowa Code § 232.2(6)(n).
The adjudication under section 232.2(6)(a) was sought only as to the children’s father.

. We note, however, that in the present case, the juvenile court made its decision based upon written exhibits that were stipulated into evidence. There were no credibility findings.

. As the court of appeals put it, these are "statutorily-defined phrases having a narrow definition.”