# IN THE COURT OF APPEALS OF IOWA

No. 18-0141
Filed May 2, 2018

**IN THE INTEREST OF A.M. and A.M.,**
**Minor Children,**

**S.M., Father,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Dallas County, Virginia Cobb, District Associate Judge.


　　A father appeals from the dispositional order confirming the removal of his children from his care. **AFFIRMED.**



　　Christine L. Sand of Wild, Baxter & Sand, P.C., Guthrie Center, for appellant father.

　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　Yvonne C. Naanep, Des Moines, guardian ad litem for minor children.



　　Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

A father appeals from the dispositional order confirming the removal of his children from his care. He contends he has complied with all of the juvenile court's requirements and objects to the court's order that he obtain a hair-stat test. Upon our de novo review, *see In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014), we find no reason to disturb the juvenile court's dispositional order. We therefore affirm.

In mid-2016, the children—a boy, age ten, and a girl, age four—came to the attention of the department of human services (DHS) due to methamphetamine use by their mother and a lack of proper supervision by their father. There was no custody order between the parents but the mother allowed the children to reside with the father, and the mother entered substance-abuse treatment.[1] Unfortunately, the father was distrustful of DHS involvement. DHS asked that he provide a hair-stat test, which he refused.

On June 9, 2017, both parents were ordered to undergo hair-stat tests on Monday, June 12, and submit the results to DHS. They were also ordered to cooperate with the Family Safety, Risk, and Permanency (FSRP) worker. On June 23, an order for ex parte removal was entered after the court found the

> mother's hair stat test showed positive results which were higher than expected; the father has not complied with a drug test as previously agreed. The children could not be placed with a non-custodial parent because both parents are involved. The children could not be placed with another relative because other appropriate relatives are unknown.

---

[1] DHS considered this placement with the father as a relative placement with the goal being reunification with the mother.

On June 27, a hearing was held at which the father agreed to allow service providers to come into his home. The court ruled the father "did not comply with the court's order to get a hair stat test" but found "there is no evidence of drug use" by the father. At the hearing, the court told DHS to accept the urinalysis (UA) results from samples provided by the father to his employer. The court's written order also provided: "[T]he court orders that the child be returned to [the father's] custody immediately; he is still ordered to obtain a hair stat test, from the provider of his choice, with results to be provided to the court by July 12, 2017."

A child-in-need-of-assistance (CINA) adjudication hearing was scheduled but was continued a number of times.

In August, the father was allowing FSRP service providers into his home. The father was told the mother was not to provide unsupervised care of the children. At the CINA adjudication hearing on September 6, the father contested the adjudication, and the hearing was rescheduled for October 24.

Despite agreeing not to allow the mother to be with the children unsupervised, DHS learned the mother was providing unsupervised care for the children. DHS social worker Sheila Aunspach informed the father DHS would be seeking a removal order for the children. The father did not attend work for the next several days and pulled the children out of school. A removal order issued on October 23, but the children's whereabouts were unknown.

The father did appear for the October 24 adjudication hearing and, upon questioning by the court, the father informed the court the children were at his home. He had left the children there without adult supervision.

Social worker Ashley Laughlin, who had been the case manager until September, testified:

> April to July [2017] mom would not address her substance abuse issue and said she no longer had a problem and was reporting that she was the one taking care of the kids when dad was at work. I believe it was in July that we asked for a hair test. That hair test came back positive for methamphetamine.
> Q. Was that for mom? A. That was for mom, yes.
> Q. Does it cause you concerns that the mother was watching the children at this point? A. It did at the time. However, the father reported that he did not know what things to look for with methamphetamine use. It concerned me that mom had put her children in that position. It concerned me that the father who has known this woman for ten plus years didn't know what any of her real indicators looked like.
> Q. Did the children's mother indicate that she had a history of methamphetamine use? A. The children's mother did.
> Q. How long of a history? A. It didn't really say a length. [The boy] did talk about the time . . . that he was asked to pee in the cup.
> Q. So in July these concerns about the mom watching the kids came up, is that right? A. That had been a concern throughout, but I believe that's the time where it was really addressed because her hair test came back positive.
> Q. So what type of arrangements were made with the parents regarding mom and seeing the kids? A. I believe it was around that time that I asked for the removal. Mom then reengaged in treatment. The children returned to the father, and mom was engaged in treatment at that time. And then on August 4th, 2017, I received an email from mom's probation officer that basically said that she had admitted to continued methamphetamine use and would be like two weeks off, two weeks on.

When asked why DHS was not requiring professionally supervised visitation, Laughlin stated:

> Legally we don't have removal from either parent at this point in time, so FSRP does not supervise contact without a removal. Even with that, being a new FSRP provider, the trauma the children had just gone through [being removed from home] and the fact that dad was cooperative at that point in time and stated that he was not going to allow mother to be alone with the children, I felt it was in the children's best interest to allow her to come over to their home with dad and see the kids.

Laughlin reported that in September the father "was willing to allow me into his home, but that was about the extent of it. He did not feel like it was his fault that DHS was involved and that he did not have to engage in services." Laughlin testified that more than a year after DHS involvement began, "[t]here still remain concerns about mother's substance abuse and father's ability to be protective of the children with regard to mother's substance abuse."

Aunspach replaced Laughlin as the supervising social worker on this case in September 2017.[2] Aunspach testified the father's one-bedroom home was "minimally adequate," though dirty, and the children were sharing one mattress. Aunspach testified the father acknowledged to her that the mother was seeing and caring for the children without supervision. She also testified the mother was not currently in treatment and she had concerns about the father's mental health or possible substance use. Aunspach summarized her concerns:

> Q. And what would you consider the imminent danger to the children's life or health if they were allowed to remain in the home? A. Mom is known to use illegal substances or we can presume that she is due to the lack of drug screening and her lack of attendance. She is not able to properly supervise these children if she is using illegal substances. And dad is allowing mom to continue to watch these children. It's concerning that dad does not have the protective capacity to know when mom is using or to question mom and to follow up with providers or professionals if she is telling them things such as the department and her attorney told her that she's able to be alone with the children. I believe that a reasonable adult would follow up on that information and not believe somebody that is a known drug user.
> Q. Just to clarify, you never gave mom permission to watch the kids? A. No.

---

[2] Aunspach testified Laughlin "felt that dad had a lack of trust for her and that it would be best for somebody else to take the case moving forward in order to hopefully be able to work better with that."

She also stated DHS "is very concerned that there had been an order for removal and that dad has been hiding the children and has not made them available for the removal to take place and that the children are not in school at this time."

The father acknowledged at the adjudication hearing he had used methamphetamine but stated it was many years ago. He also admitted that he did leave his daughter in the mother's unsupervised care "[b]ecause I didn't have nobody else to watch her while I was at work." He stated the mother was alone with the child "about three hours a day" and the mother had informed him "she had talked to her lawyer and to one of the DHS ladies and they said it was all right." He had not confirmed the information with anyone else. He stated he had no concerns the mother was still using methamphetamine because "she said she had been going [to treatment], that she had been dropping clean UAs." Again, he had not confirmed the mother's claims with anyone else. The father also acknowledged he knew the court had ordered the children's removal but he felt the children were safer in his care than in DHS's.

The following exchange occurred on cross-examination:

Q. So do you normally just accept [the mother] at her word? A. No. But when I'm stuck in a position of not having a baby-sitter and I have to get to work, I didn't feel like she was high.
Q. Can you recognize when she's high? A. Sometimes. I mean—
Q. Well, what sort of symptoms do you see from her when she's using? A. She is—she doesn't do what she says she's going to do. She doesn't come around.
Q. So do you truthfully feel you're able to identify when she's using and when she's not? A. If she tried to hide it, I probably couldn't tell.
 . . . .
Q. So why wouldn't you follow up, sir, to make sure that she's clean and sober? A. Because I don't feel that they're in danger.

Q. Why don't you feel that that's any danger? A. Because it's their mother. I mean, I don't know.

The State and the guardian ad litem argued the children were in need of assistance and the mother stipulated to the children's being adjudicated as CINA. The father objected to any CINA adjudication.

The court orally ruled the children were in need of assistance. The court expressed its concerns about the mother's ongoing substance-abuse issues and the father's lack of supervision. The court noted the father admitted to leaving the boy home alone when he was sick and to leaving the boy home alone the day of the hearing in charge of his younger sister. The court found most concerning, however, that after learning of the court order to remove the children, the father decided to evade the court's order. The court confirmed the order to remove the children and place them in the custody of DHS for relative placement.[3]

On November 1, the State made application for a change of placement, asserting that since the October 24 ruling, "the two relatives that were being considered as relative placements are no longer available. . . . Three relatives have stated to DHS that they believe the children's father is using methamphetamine. The children have not been attending school since the

---

[3] The court added:

> I only want this to be until [the father] has worked with DHS to try to help with some of these supervision issues like before and aftercare at school, if that would help with your work situation, locating an in-home daycare or something like that that would be close enough and where if you have a sick child or—you know, or locate a person that you can line up so that that is in effect kind of a safety plan that you could work out, then I am happy to get those kids back to you just as fast as I can.

A maternal aunt had agreed to provide care for the children.

October 24 hearing." The court granted the application, and DHS placed the children with other relatives who had been found to be appropriate caretakers.

A dispositional hearing was held on December 5 and 20, 2017. Social worker Aunspach testified the children were in the care of a paternal uncle and aunt and were doing "very well." She stated FSRP services and daycare assistance were being provided to the family. The mother had been participating in supervised visits with the children, though not on a consistent basis. The mother was reportedly pregnant and not participating in substance-abuse treatment. The father was working full time but expected to be laid off from the end of December 2017 until March 2018. He had received some transportation assistance to supervised visits with the children. Aunspach recommended the children remain in the care of the relatives, expressing concern about possible substance abuse by the father. In her written report to the court and testimony, Aunspach pointed to behavioral indicators such as paranoia, mood swings, lack of cleanliness of the home, and poor hygiene. She noted the father's ongoing distrust of DHS and lack of cooperation and communication with her. She also noted the father's refusal to comply with the court-ordered drug testing earlier in the proceedings and the post-adjudication statements by the mother and maternal relatives that the father had used methamphetamine for the past fifteen years. Aunspach also testified the maternal relatives reported "they have no reason to believe he's not still using." She recommended the father have a mental-health assessment and a substance-abuse evaluation. She also asked that the father be required to provide a hair test for analysis or random UAs.

FSRP consultant Jody Phillips testified that soon after she began working with the family in July or August 2017, she believed the father had been using some type of drug. She observed the father exhibiting signs of drug use:

> I observed his right side of his body to be having muscle spasms continuously for about an hour. When asked he said he didn't notice that. And he was very talkative to me that evening, which in the beginning when I took over this case it was hard to get him to communicate with me, so it was abnormal for him to be talkative and allow me into the home.

Phillips stated she raised her concern with DHS. She also testified she had a telephone conversation with the mother's sister-in-law while she had the children in her care following removal and she "told [Phillips] that she believes that [the father] has always used and has not stopped using."

Phillips also stated she had consistently recommended to the father that he clean his home and noted a "trash buildup on the floor, food that hadn't been cleaned in the kitchen for quite a while, and just the floor in general . . . would pose a safety concern for younger children." She testified the father had participated in discussions with her about securing appropriate daycare after the children were removed and she provided a list of people for him to call, but two weeks later he had not made any calls.

The court orally continued the children's removal and ordered that before the children could return to the father, the father was to submit for a hair-stat test.[4] The court also ruled that the father needed to clean his residence so it was suitable

---

[4] The court observed, because the father admitted using methamphetamine in the past and "you physically are constantly moving, what seems to me be some paranoia . . . but I would like to eliminate the concerns. I want a hair stat test and then it's over. You know, if it comes back clean, we don't have a problem with it anymore."

for the children and ensure that the children had "appropriate places to sleep"—

"They need to have beds." In addition, though not required before the children

could be returned, the court ordered the father to have mental-health evaluation,

arrange for daycare for when he returned to work, and ensure the children were

able to continue counseling.

A written dispositional order was filed on January 4, 2018, which provided

in part:

> (2) The court makes the following specific findings of fact: the
> children have been out of the home since October 19, 2017; the
> children's mother is pregnant; the children are doing well with their
> uncle and aunt; father is exercising visitation but has had limited
> contact with DHS; mother has reengaged with services; the court has
> found the testimony regarding the father's family of origin useful;
> based on statements of relatives, DHS still has concerns regarding
> the father using illegal drugs; the testimony of the witness is not
> necessarily reliable regarding possible drug use by the father
> however behavioral indicators and direct observation have
> reaffirmed the concern over possible drug use; the court
> acknowledges that the father has a distrust for the juvenile court
> system that may not be based on his drug use.
> (3) The children shall remain in or be placed in out of home
> placement. Placement outside the parental home is necessary
> because continued placement in or a return to the home would be
> contrary to the child's welfare due to concerns over mother's
> substance abuse and concerns over father's supervision of the
> children.

The father appeals. He does not challenge the children's CINA adjudication

but argues the children should be returned to him pursuant to Iowa Code sections

232.102(6)[5] and 232.103(4)[6] (2017). He asserts he has provided negative UAs

and challenges DHS's "continual focus" on his "alleged substance abuse."

---

[5] Section 232.102(6) provides: "Whenever possible the court should permit the child to remain at home with the child's parent, guardian, or custodian."
[6] Section 232.103(4) provides:

"[A] juvenile court is authorized to terminate a dispositional order only if 'the purposes of the [dispositional] order have been accomplished and the child is no longer in need of supervision, care, or treatment.'" *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) (second alteration in original) (citation omitted).

The father's continued demonstration of an inability to protect the children and allowing them to have unsupervised contact with their mother establishes a risk of inadequate supervision. In addition, in light of the father's admitted past use of methamphetamine, his continued refusal to provide a hair-stat drug test despite court orders, the testimony of the FSRP provider about the father's behavioral indicators of drug use, and the court's observations of the father's behavioral characteristics at the dispositional hearing, we conclude the juvenile court had ample reasons to continue the children's removal and order the father to obtain a hair-stat drug test. We find no merit in the argument that there was no evidence and only speculation the father was using illegal substances when the father steadfastly refuses—notwithstanding an order of the court—to obtain a hair-stat drug test. Finding no reason to disturb the dispositional order, we affirm.

**AFFIRMED.**

---

The court may modify a dispositional order, vacate and substitute a dispositional order, or terminate a dispositional order and release the child if the court finds that any of the following circumstances exist:

(a) The purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment.

(b) The purposes of the order cannot reasonably be accomplished.

(c) The efforts made to effect the purposes of the order have been unsuccessful and other options to effect the purposes of the order are not available.

(d) The purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted.