**IN THE COURT OF APPEALS OF IOWA**

No. 23-0814
Filed July 13, 2023

**IN THE INTEREST OF O.F. and G.F.,**
**Minor Children,**

**TAMMY BANNING, Guardian Ad Litem,**
　　Appellant,

**STATE OF IOWA,**
　　Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.

The children, through their attorney and guardian ad litem, and the State appeal from the dispositional order, challenging the visitation provisions allowing the mother to transition to semi-supervised visits and to supervise the father's contact with the children. **REVERSED IN PART ON BOTH APPEALS.**

Tammy Banning of Waterloo Juvenile Public Defender, Waterloo, appellant attorney and guardian ad litem for minor children.

Brenna Bird, Attorney General, and Erin Mayfield and Mary A. Triick (until withdrawal), Assistant Attorneys General, for appellant State.

Michele R. McCann, Cedar Falls, for appellee father.

Michelle M. Jungers of Jungers Law PLLC, Waterloo, for appellee mother.

Considered by Bower, C.J., and Tabor and Greer, JJ.

**GREER, Judge.**

O.F. (born in 2020) and G.F. (born in 2022) were removed from their parents' care in July 2022 after G.F. presented at the emergency room with serious injuries that neither parent could adequately explain. Since that time, both children were adjudicated a child in need of assistance (CINA) and have remained in the care of their paternal grandparents. In the May 2023 dispositional order, the juvenile court ordered the children to remain in the custody of the Iowa Department of Health and Human Services. No party challenges this ruling. The court also ruled "that the best interests of the children require that a transition should begin while under the supervision of the juvenile court." The transition, as outlined by the court, allowed the mother semi-supervised visits with the children and allowed her to supervise the father's contact with the children. Both the State and the children, through their attorney and guardian ad litem (GAL), challenge this portion of the dispositional order.[1]

**I. Background Facts and Proceedings.**

At about 10:00 a.m. on June 30, 2022, G.F. was taken to a local emergency room by her father and grandmother. The father reported he was carrying three-month-old G.F. the night before when O.F. hugged his legs, causing him to trip. He described tossing G.F. onto the nearby couch as he fell so as not to land on top of her. He also reported that his hand was stuck in G.F.'s swaddle and he heard a pop (though was not sure where the noise came from) and that when he

---

[1] The State and GAL asked that the implementation of the visitation transition be stayed pending this appeal, and our supreme court granted the motions for stay before transferring the case to us.

got up and reached G.F., her eyes were rolled back into her head and her arms were tense. The mother, who is a registered nurse, was not at home at the time, but she returned shortly after. Neither she nor the father sought medical help for G.F. Testing at the emergency room showed G.F. had bilateral subdural hematomas or bleeding on the brain. Because that hospital did not have a pediatric neurologist, G.F. was sent by helicopter to the University of Iowa Hospitals and Clinics (UIHC).

Following additional testing at UIHC, it was determined that besides the subdural hematomas, G.F. also had multiple spots and layers of retina hemorrhages in both eyes and both of her femurs were fractured. A number of tests were completed to rule out possible underlying medical conditions and genetic disorders; none of the test results provided a medical explanation for G.F.'s injuries. Ultimately, UIHC's child protection team concluded G.F.'s injuries were nonaccidental and opined that child abuse was the mostly likely explanation for her constellation of injuries.

Before G.F. was discharged from UIHC, both G.F. and O.F. were removed from the parents' custody. The department placed them in the care of the paternal grandparents.

At the CINA hearing, Erin Brown, who is a family and pediatric nurse practitioner[2] and member of the child protection team at UIHC, testified that femur

---

[2] Brown graduated from the United States Air Force Academy with a bachelor's degree in biopsychology, received a master of science in nursing from Vanderbilt University with a family nurse practitioner specialty, and obtained post-graduate certifications in pediatric acute care and pediatric primary care nursing specialty studies along with a doctorate of nursing practice at the University of Iowa.

fractures are something you would expect to see "in car accidents, so a high velocity impact type event, and we can see it with a violent kind of twisting-pulling type motion. It is not a type of fracture that you would see with like regular care, like I'm changing my child's diaper in a way." She characterized the retinal hemorrhages similarly, testifying that for them to occur "require[s] kind of, again, that same type of sheering or rotational acceleration/deceleration forces to have that degree." Brown testified that G.F. "appears to be a victim of child physical abuse . . . with abusive head trauma etiology."

Following the CINA hearing, the juvenile court adjudicated both G.F. and O.F. in need of assistance and confirmed their removal from their parents' custody. The court ruled:

> The parents' story does not adequately explain the medical findings, nor the serious extent of the child's injuries. The child's severe injuries are not accidental in nature. [G.F.] endured a yet unexplained significant abusive incident where she experienced such severe acceleration and deceleration and impact to her head that caused significant brain and retinal hemorrhaging. That the abusive incident was inflicted with such severe force that it resulted [in] both of her femurs being fractured. That the injuries are not accidental in nature and consistent with physical abuse upon an infant. No other party is alleged to have been caring for the children during the time period in question, other than the parents . . . .

In March 2023, the father was criminally charged with child endangerment causing serious bodily injury. Even after the criminal charge, both the mother and father were able to visit and parent the children so long as the grandparents were present and supervising, and the parents provided much of the care to the children on a daily basis. The parents were engaged in services, including parenting classes and mental-health therapy.

As of the March disposition hearing, the parents either could not or would not explain how G.F. sustained her injuries, other than maintaining the version of events given to the emergency personnel. The father had yet to testify in any hearing. The mother recognized that the medical providers believed the injuries were nonaccidental but she testified she was not present for any injury to G.F., did not know what happened, and did not believe the injuries were purposely inflicted. When asked about the delay in medical care for G.F. after the injuries on the evening of June 29, the mother downplayed the issue, testifying:

> Q. . . . Have you ever said you—if you went back in time that, knowing what you now know, you still would not have sought medical treatment for [G.F.]? A. No. I believe I testified in court that knowing at the time what I did I was doing what was best for my daughter.
>
> Q. You thought at the moment— A. At the moment I thought I was doing what was best for her, yes.
>
> . . . .
>
> Q. Earlier about not taking [G.F.] for medical treatment you said if I had x-ray vision I would have taken her in right away. Can you explain what you meant by that? A. I mean, if I knew at the time the injuries occurred that she had two broken legs, I would have brought her in immediately, but at the time all I knew was what [the father] told me happened, and she was not symptomatic. I know it's reported in all the medical reports that she was, but that's not true. I got home that night. I was able to change her diaper, assess her. She was—there was no injuries that I could see. I fed her, gave her Tylenol and she slept until at least [3:00] a.m.
>
> Q. But when you got home that night and you were assessing her, weren't you aware that she'd had a head injury? A. No.
>
> Q. So [the father] hadn't told you about the fall? A. Yes. But how was I supposed to know there was a head injury.
>
> Q. He didn't tell you that when he got to her— A. Yes. Her eyes rolled back and she was tense, but I looked at it as it could have been shock from being thrown across the room. And, yes, I understand that other people say I should have brought her in, but if we brought her in that night, they would have given her Tylenol, like I did. She would have been sleeping and they would have sent us home.
>
> Q. How do you know that? A. Because when we brought her in the next morning, even though she was very inconsolable, they didn't do the imaging immediately. You would think, right, that if there

was a head injury they would have done the imaging right away, right, but they didn't.

Q. Did they discharge her without doing any imaging on her head? A. No. But they waited over two hours to do the imaging. If it was that big of a concern that there was a brain injury, they would have done it immediately. So I don't know why I'm the only one to blame for it when they didn't do it right away either.

At disposition, the State and the GAL took the position that all visits should remain fully supervised. Their position matched that of the department, which asserted in its report to the court, "Absent an explanation that matches the science, it is impossible to have a reasonable assurance that the children would be safe from future harm should they return to the care of their parents."

In the dispositional order, the juvenile court found:

The children have been removed from the care of their parents for nearly one year. Despite a goal for reunification, the State's position is clear that no recommendations for a return of care to a parent will occur until one or both of the parents provide an explanation for the injuries sustained by [G.F.], or [accepts] responsibility. [G.F.] has responded well to her medical treatment and reportedly is a healthy child. The Court must believe that the services being offered to families in the Juvenile Court have a benefit, are capable of effecting change and rehabilitating those the services are being offered. Many of the cases which come before the court include parents' unwilling to acknowledge their addictions or abuse. However, after providing clean drug tests or following through with services, the children who have been removed often are able to return home. [The mother and father] have been under a microscope for almost one year. [They] have engaged in nearly every service available through the Juvenile Court. [They] have exercised extensive supervised visitation. [They] have very strong family support. [The mother] is no longer working as a nurse and is available for extensive visitation. [The father] works from home and is also available for regular visitation. Both parents have been able to be with their children nearly every waking hour while under the supervision of the grandparents. The grandparents remain very supportive of both parents and requirements of the court. Other than the parents' inability to explain the injuries sustained by [G.F.] the only concern identified has been that [the mother and father] may be "passive parents," in that they tend to give in to the children's wants.

The court concluded the best interests of the children required the transition to semi-supervised visits for the mother and allowing the mother to supervise the father's contact with the children.[3]

The State and the GAL appeal.

## II. Standard of Review.

Our review of CINA proceedings is de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). "In reviewing the proceedings, we are not bound by the juvenile court's fact findings; however, we do give them weight." *Id.* As always, "[o]ur primary concern is the children's best interests." *Id.*

## III. Discussion.

In its CINA order, the juvenile court concluded that G.F.'s injuries were "severe" and "not accidental in nature." Neither parent challenges those findings. Additionally, the court recognized the injuries were the result of "a yet unexplained significant abusive incident." And that remained true at the time of the disposition

---

[3] Specifically, the court ordered:

Said transition shall begin with four-hour semi-supervised visitations (Monday–Friday) in the grandparent's home for a period of four (4) weeks. After three weeks and no safety concerns being reported, semi-supervised visits shall move to eight hours in length (Monday-Friday) for a period of four (4) weeks. Any contact between the children and [the father] shall remain supervised by [the mother]. [The father] shall not be left in the sole supervision of the children at any time during the period of semi-supervised visitations. If [the father] is found in the sole care of the children during semi-supervised visitations, all visits between both parents shall immediately return to fully supervised until further order of this court. The [department], [GAL], [court appointed special advocate (CASA)], and/or any individual designated by the [department] shall be authorized to conduct frequent drop-ins during the semi-supervised visitation period. Following eight-week period of semi-supervised visitation the matters shall be reviewed by the court for further determination on moving to unsupervised visitation.

hearing—about nine months after the injuries took place. Yet, the juvenile court concluded it was in the children's best interests to begin spending semi-supervised time with the mother and leaving only the mother to supervise the father's contact with the children.

Our courts have long recognized that it is an "awesome challenge" to treat a parent for a deficit the parent claims not to have. *See In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). Because "[w]ithout knowing what services were appropriate due to the parents' unwillingness to disclose what happened to their child, the department's hands [are] tied in providing the necessary services to address the protection of the child." *In re H.H.*, No. 23-0146, 2023 WL 2909070, at *3 (Iowa Ct. App. Apr. 12, 2023). "The requirement that a parent acknowledge and recognize abuse is essential for any meaningful change to occur." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa 1999). "Without this acknowledgement, the services provided [are] not likely to be effective." *Id.* As the department's social work case manager testified, "If concerns aren't acknowledged, if the problem isn't acknowledged, then it's difficult to discuss what . . . it's going to take to resolve that concern." She noted that the department laid out "steps and the goals" related to reunification but reaching the goal requires accountability.[4] So even though the parents completed steps required for reunification, which the court emphasized in its ruling, no person could yet explain the cause for the severe injuries suffered by G.F., so the goal could not be met. Thus, it is difficult to know if the core concerns were met by the services offered to ensure safety going forward.

---

[4] The department's goals included: "Parents/Caregivers will gain insight/provide transparency with respect to the events that led to [G.F.'s] injuries."

So to that end, while these parents completed services geared toward general parenting concerns, our concern for safety requires that we can confidently say the services effectively addressed the issue and the children will be safe with the parents. *See In re D.D.,* 955 N.W.2d 186, 197 (Iowa 2021) (Christensen, C.J., concurring specially) ("It is incumbent upon the juvenile court to determine a[] . . . course of action to keep [the child] safe instead of simply crossing its fingers and hoping [the parent] will not reoffend."). But that is not what we have here. While the parents were participating in services, participation is not the same as making meaningful changes. *See id.* at 192 ("Progress in therapy and similar efforts to 'put the work in' are unquestionably important. But the statute doesn't ask whether all the boxes have been checked or the work put in; it asks whether the child remains in need of supervision, care, or treatment."). And the juvenile court made no findings that these parents actually are more prepared or better able to safely parent these children.

The juvenile court seemed to decide that the transition to semi-supervised visits was necessary so this family could get to reunification before the clock ran out. But "[r]eunification is a *goal,* not a mandate." *Id.* at 196 (Christensen, C.J., concurring specially). And while the State and GAL may, at first blush, have seemed obstinate in their positions that the case not progress until more was known about how G.F. was injured, when a parent refuses to make the necessary change to keep their children safe, then "[the parent]—not the system—has drawn a harsh line in the sand that precludes reunification." *Id.* at 197 (Christensen, C.J., concurring specially); *see also In re K.C.,* No. 18-1249, 2019 WL 325863, at *3

(Iowa Ct. App. Jan. 23, 2019) (recognizing it was the parent who failed to address their role in the child's injuries that was the barrier to reunification).

Based on the consistent version of events told by the parents, the mother was not present at the time G.F. sustained her injuries. And we recognize the mother cannot offer more information about an event of which she has no knowledge. But the mother also does not believe that G.F.'s injuries were intentionally caused[5] in spite of the opinion of a number of medical professionals and the CINA adjudication entered by the court. And "[i]t's folly to think the mother will stand sentinel to protect against a foe she doesn't acknowledge exists." *D.D.*, 955 N.W.2d at 193. Thus, allowing the mother to act as supervisor over the father's care goes against what our cases have taught when denial is involved.

The department is required to make reasonable efforts to reunify these children with the mother and father. *See In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005). But the children's "health and safety [is] the paramount concern in making reasonable efforts." Iowa Code § 232.102A(1)(a) (2022). Without more than the juvenile court's belief that services must be working, we cannot conclude that the transition in visitation laid out by the juvenile court is in the children's best interests. *See In re M.B.*, 553 N.W.2d 343, 346 (Iowa Ct. App. 1996) ("[C]hildren

---

[5] In her reunification/transitional proposal for the court, filed after the dispositional hearing, the mother went only so far as to say that she "acknowledged that the injuries suffered by [G.F.] were scientifically likely to have been caused by non-accidental trauma." But she was steadfast that the father did not intentionally inflict the injuries on G.F., testifying "I do not believe he did it. . . . [B]ut I also know that you guys believe he may have and so I'm willing to do whatever it takes to get my kids home, but I'm not willing to testify that he did it because I don't know for certain who or if they were even intentionally inflicted on my daughter."

should not be placed at risk so their parents can experiment with their parenting skills.").

We reverse the juvenile court's dispositional ruling to the extent it orders visitation to transition to semi-supervised. Visitation is to remain at the discretion of the department in consultation with the GAL.

**REVERSED IN PART ON BOTH APPEALS.**