# IN THE COURT OF APPEALS OF IOWA

No. 24-0094
Filed July 3, 2024

**IN THE INTEREST OF D.A.,**
**Minor Child,**

**K.G., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Warren County, William A. Price (adjudication) and Mark F. Schlenker (disposition), Judges.

The mother appeals the child-in-need-of-assistance adjudication and the removal of her child from her custody. **AFFIRMED.**

Lori M. Holm, Des Moines, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Magdalena Reese of Juvenile Public Defender Office, Des Moines, attorney and guardian ad litem for minor child.

Considered by Schumacher, P.J., Ahlers, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BLANE, Senior Judge.**

K.G. appeals the child-in-need-of-assistance (CINA) adjudication and disposition regarding her child, D.A. K.G. contends that the State failed to prove the grounds for adjudication and removal of the child from her custody was required. Because we find the State proved a statutory ground for adjudication by clear and convincing evidence and it was contrary to the welfare of the child to be in K.G.'s parental custody, we affirm.

## I. Background facts and proceedings.

This family has been the subject of previous child-welfare interventions due to K.G.'s use of methamphetamine and other drugs. K.G. lost parental rights to her three older children;[1] the most recent termination was in September 2021.

K.G. gave birth to D.A. in March 2022. At birth, D.A. tested positive for amphetamines. Both K.G. and the father, C.A., also tested positive for methamphetamine. The State filed a CINA petition. After the parents received services, the case was closed in January 2023 with a bridge order providing for D.A.'s joint custody and shared care between his mother and father. K.G. and C.A.'s relationship disintegrated, but they continued to follow the custody arrangement. C.A. remained in Lucas County while K.G. relocated to Indianola in Warren County in August 2022.

In late July 2023, the Iowa Department of Health and Human Services received two reports and initiated two child abuse assessments for D.A. The first

---

[1] K.G. testified she gave her first child up for adoption voluntarily. Our record shows CINA and termination-of-parental-rights proceedings for only three children other than D.A.

was directed at C.A. for bruises and bite marks or scratches sustained while in C.A.'s care. The department did not confirm that report. The second report was directed at K.G. for alleged substance use while living with D.A. The tipster stated K.G. had sores on her face and "appears to have lost 40–50 lbs. within the last month." That report was also not confirmed.[2] The investigator, a child protective worker (CPW), agreed that K.G. did not appear to have lost that much weight. And she explained the sores on her face as due to a medical condition.

On September 8, 2023, the State petitioned alleging D.A. was a CINA under Iowa Code section 232.96A(3)(b) (2023). The State asserted D.A. "has or is imminently likely to suffer harmful effects as a result of the failure of the child's parent . . . to exercise a reasonable degree of care in supervising" him. The petition alleged that during the assessment, K.G. demonstrated little or no cooperation with the department "given the concerns that were being alleged." The petition noted K.G.'s history with the department based on her drug use, that K.G. had "sores visible on her face" and had "refused to submit to drug testing . . . on [three] separate occasions." Because K.G. was "displaying behavior indicators such as these," the department urged finding eighteen-month-old D.A. was a CINA.

At the November adjudication hearing, the CPW testified that upon being assigned he met with K.G. at her residence, requested she submit to a drug test on July 28 and provided her the testing information.[3] He reported that K.G. was

---

[2] K.G. theorized that C.A. made this anonymous report because he was angry at her and wanted to deprive her of custody by accusing her of using drugs.

[3] After their August 28 meeting, during which K.G. had D.A. in her care, the CPW spoke with C.A. and advised him to act "protectively" toward D.A. regarding his

adamant she did not want to do any hair test, but the CPW explained the testing site selected the type of test at random. K.G. acknowledges not following the CPW's directions regarding that July 29 test, testifying that the test site was not a clinic or hospital but a hotel. She explained, "I thought maybe I was at the wrong place because I've never heard of a drug test being performed at a hotel." She tried to call the CPW, but he did not respond. She then had to report for work, so she left. She admitted that she never went into the hotel to check if there was a testing site located there. The next morning, though, she went to MercyOne in Indianola and obtained a urine drug screen, which was negative. On August 1, the department worker again requested K.G. submit to a drug test at a location in Des Moines.[4] K.G. testified the test was for "three o'clock in the afternoon, and there was no way [she'd] find a ride before they closed" so she instead went to Broadlawns Hospital and obtained another urinalysis that same day, which was negative.

At the pre-trial conference in late September the parties reached an agreement that K.G. would submit to a drug patch test and if it came back negative the State would dismiss the CINA petition. The sweat patch test was applied to K.G. on September 27, but the PharmChem employee[5] testified that when she

---

suspicions of K.G.'s drug use. So, in defiance of the bridge order, C.A. kept D.A. and refused to return him to K.G. as required by their shared care arrangement. So D.A. was not formally removed from K.G.'s custody until the adjudication order. K.G. testified she tried to file a contempt action against C.A. for violating the custody order, but the record is not clear about the progress of that action.

[4] K.G. denies the worker requested this second drug test.

[5] PharmChem is the private company that contracts with the department to provide patch testing. The PharmChem employee testified she does not have scientific training, only on-the-job training applying and removing patches. The employee

went to remove it on October 6, the patch appeared to have been tampered with. The State offered several photographs of the patch: one showed K.G.'s shortly after the collection patch and plastic overlay were applied. Another showed the plastic overlay after its removal. The PharmChem employee testified she believed the patch was tampered with based on the smearing of ink from the printed PharmChem label and identification code on the patch overlay and the jagged edge of the overlay. K.G. denied any tampering. But she testified she was suspicious of the drug patch test and was "suspicious of all drug tests through [the department]." The PharmChem employee did not notify K.G. she believed the patch was tampered with; she also testified that the general policy of her employer is to not disclose that suspicion to the client. When tested the patch was negative.

K.G. testified that from the commencement of the assessment in July to the hearing she cooperated with the department. She also produced records showing that on August 1 and 13, while at an emergency room, she was administered a toxicology (blood/serum) screen which came back negative for drugs. In addition, on August 28, she obtained a private hair screen test that was also negative. She testified her sobriety date was her son's birthday in March 2022. As for the sores on her face, K.G. testified that she was being treated for an auto-immune condition that was the source of the lesions. She also submitted a letter dated October 27, 2023, from her oncological hematologist at MercyOne who was treating her for a blood condition. The letter explained that, starting August 8, K.G. underwent a course of treatment in preparation for a bone marrow biopsy and was receiving

who testified about the patch removal was not the employee who applied the patch on K.G.

weekly blood infusions of iron. This required blood tests before each infusion that included a drug screen, and all of those screens were negative. K.G. testified that she had two infusion appointments and thus two drug screens while she was wearing the patch, and both screens were negative for drugs.

In the adjudication order, the juvenile court made explicit findings that the CPW and PharmChem employee were credible and K.G. was not credible, and held that K.G. had tampered with the patch test and, although the patch was negative for drugs, it was not a valid test result. Following the hearing, the court concluded:

> Mother, despite her long experience with DHS elected to ignore the request to provide specimen and relied on not doing random test and expect it to suffice. The Court considers her [department] history and that she is not a babe in the woods. Mother decided to do it on her own terms. Due to her history and the child being positive at birth, that the overlay was tampered with and that mother had only one visit and elected to use the visitation time to argue with [the department] and threating to leave with the child and either caused or requested the police to come to the visitation, the child is imminently likely to not have a reasonable degree of care if the child remained in the mother's custody. The child shall be removed from the mother and placed with dad under [department] supervision.

D.A.'s guardian ad litem supported the adjudication. Ultimately the court agreed with the State that the mother was not "cooperat[ing] with the [department] to ensure the child is safe." It ordered D.A. removed from K.G. and placed him in the legal custody of his father.

The court held a disposition hearing in January 2024. K.G. failed to attend. The department worker reported that K.G. had not yet completed updated substance-use or mental-health evaluations, despite the department's requests and her assurances that she had one scheduled. K.G.'s counsel requested that

the bridge order be reinstated as the least restrictive disposition. But the disposition order confirmed the CINA adjudication and continued D.A.'s placement with his father under department supervision. K.G. appeals.

**II. Standard of review.**

We review CINA proceedings de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). In engaging in such a review, we give weight to the juvenile court's findings of fact but are not bound by them. *Id.* "The State bears the burden of proving child in need of assistance allegations by clear and convincing evidence." *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). To meet that standard, we must "harbor no serious or substantial doubts about the accuracy of the legal conclusions drawn from the evidence." *In re S.O.*, 967 N.W.2d 198, 201 n.1 (Iowa Ct. App. 2021). "The most important consideration in any CINA case is the best interests of the child." *D.D.*, 653 N.W.2d at 362.

**III. Discussion.**

On appeal, K.G. contends she presented evidence of at least three negative drug tests, including one hair stat test, and two emergency room records that reported weekly blood tests negative for drugs. K.G. points out that the department did not investigate any of the medical information she submitted showing negative drug tests that support her claim to be substance free. She argues that this evidence is more compelling and overrides the court's finding of clear and convincing evidence.

The juvenile court adjudicated D.A. as a CINA under Iowa Code section 232.96A(3)(b) for when "[t]he child has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of child's parent . . . to exercise

a reasonable degree of care in supervising the child." The "harmful effects" referred to in Iowa Code section 232.96A(3)(b) are defined broadly and established "when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur." *J.S.*, 846 N.W.2d at 41–42. The State alleged the harm was imminently likely due to K.G.'s lack of cooperation with the department "given the concerns that were being alleged." The safety concern in this case is K.G.'s alleged drug use. "[A] juvenile court could reasonably determine that a parent's active addiction to methamphetamine is 'imminently likely' to result in harmful effects" to the child. *Id.* at 42. And it need "not require neglect or physical or sexual abuse to be on the verge of happening before adjudicating a child as one in need of assistance." *Id.* at 43.

The State did not present any direct evidence that K.G. did not maintain her sobriety throughout this case. It points to the "missed drug tests" and our unpublished dispositions for the oft-repeated rule that we can presume a missed test is positive. *See, e.g.*, *In re C.W.*, No. 14-1501, 2014 WL 5865351, at *2 (Iowa Ct. App. Nov. 13, 2014) (finding the mother "missed several drug screens, which are thus presumed 'dirty,' i.e., they would have been positive for illegal substances").

But K.G. presented other evidence to suggest the missed tests would have been negative and that she was not using drugs. The CPW testified that for methamphetamine, urine has a detection window of two to five days, and sweat patches have a detection window of seven to fourteen days. So both the July 30 and August 1 urinalyses and the patch screen in the record should have detected drugs even if K.G. was late in submitting them. She also points to her negative

emergency room toxicology screen on August 13 and the negative blood screens through her hematologist. The CPW testified those were not valid tests because they were not "random" and "observed."

K.G.'s prior terminations centered around her mental-health and substance-use issues. But the last termination was in 2021, more than two years before this adjudication. K.G. testified she had been sober since D.A.'s birth and there is no positive drug test in the record. Even the report initiating the child abuse assessment was unsubstantiated—the investigator agreed K.G. did not look like she had lost "40–50 lbs within the last month" and she offered a medical reason for the sores on her face. The report noted nothing in her behavior or mannerisms that pointed toward active drug use. And the report was unconfirmed. K.G. has had shared custody and care of D.A. since the bridge order was entered in January 2023, and there has never been a demonstrated harm to D.A.'s physical, mental, or social well-being while in her care. K.G. has also maintained an appropriate home for D.A. as well as steady employment.

Assuming without deciding that we cannot presume the "missed tests" would be positive, we note we have also considered a parent tampering with or falsifying a test as evidence that the parent is using a controlled substance. *See, e.g., In re P.W.*, No. 2014, 2024 WL 1297049, at *2, 3 (Iowa Ct. App. Mar. 27, 2024). The failure of a parent to cooperate with the department and failure to utilize offered services may also be considered. *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000).

The facts in this appeal present a challenging issue. On the one hand, the mother submitted a substantial amount of evidence that numerous drug tests over

a several-month-period were negative. On the other, the State presented evidence that the mother refused to follow drug testing directed by the department and tampered with a drug patch test. So is the State's evidence sufficient to support a clear and convincing finding that D.A. is "imminently likely to suffer harmful effects as a result of [K.G.'s] failure . . . to exercise a reasonable degree of care" if the child remained in the mother's custody? Iowa Code § 232.96A(3)(b). It is close, but we think there is sufficient proof.

This is K.G.'s fourth child to be brought into the child-welfare system and she is familiar with drug testing procedures and expectations. D.A. was born testing positive for methamphetamine, and K.G. has a long-standing substance-use problem, yet she never completed an updated substance-use evaluation despite assuring the department she had an appointment set up. As for testing, K.G. tampered with the only drug test where both the department requested it and she submitted to it. All the other tests in this record were more or less on her own terms and deserve less weight. While we do not suggest such alternative tests could never establish a parent's sobriety, K.G.'s history and lack of cooperation with the department provide clear and convincing evidence that she is unable to exercise a reasonable degree of care with D.A. in her custody.

On this record, the court was not required to wait for a drug-related harm to befall D.A. *See J.S.*, 846 N.W.2d at 43 (citing case law supporting a "liberal interpretation" of "imminently likely"). The evidence supported the court's finding that D.A. was "imminently likely to suffer harmful effects as a result of the failure of child's parent . . . to exercise a reasonable degree of care in supervising the child" and continued removal from the mother's custody was warranted. Iowa Code

§ 232.96A(3)(b); *accord id.* §§ 232.95(2)(a), 232.102. By sustaining the CINA proceedings, D.A.'s best interests are served by allowing continued juvenile court supervision while K.G. demonstrates her sobriety to speedily reunify with her son.

**AFFIRMED.**