# IN THE COURT OF APPEALS OF IOWA

No. 20-0081
Filed June 3, 2020

**IN THE INTEREST OF J.H.,**
**Minor Child,**

**STATE OF IOWA,**
        Appellant,

**A.H., Grandfather,**
        Intervenor-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, David F. Staudt,

Judge.

        The State and the paternal grandfather separately appeal the juvenile court

order removing the Iowa Department of Human Services as the child's guardian.

**AFFIRMED.**

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellant State.

        Linda A. Hall of Linda Hall Law Firm, PLLC, Cedar Falls, for intervenor-

appellant.

        Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, for appellee foster

parents.

        Melissa A. Anderson-Seeber of Juvenile Public Defender's Office,

Waterloo, attorney and guardian ad litem for minor child.

        Considered by Bower, C.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

A good process is everything. After the five-member adoption staffing conference, participants voted three to one in favor of the foster parent placement over the paternal grandfather to adopt J.H.[1] Then the non-participant supervisors negated the committee decision and instead chose the grandfather as the adoptive option. After the district court removed the Iowa Department of Human Services (DHS) as J.H.'s guardian and placed the child in the custody of foster parents for adoption, the State and J.H.'s paternal grandfather appealed seeking reversal of the court order. Having deviated from the process established under the Iowa Administrative Code and DHS's own policy manual, we conclude DHS acted unreasonably in its selection of the adoptive family and affirm the juvenile court order removing DHS as the child's guardian.

## I. Background Facts and Proceedings.

J.H. was born in May 2018. The child was removed from her parents' custody shortly after birth because of the parents' mental-health and substance-abuse issues. The State filed a child-in-need-of-assistance (CINA) petition, and J.H.'s parents generally failed to participate in services and did not make any serious efforts at sobriety. Eventually the State petitioned to terminate their parental rights.

About two days after removal from her parents' care, the child was placed with her paternal grandfather. She stayed with him until December, at which point he asked that the child be placed in foster care. At that time, the grandfather stated

---

[1] Because one participant found each option equally viable, the trial court treated the undecided vote as a non-vote.

he was not an adoptive placement for the child. Because the foster parents, J.K.-B. and K.K.-B., provided day care for J.H. daily starting within days of the child's birth, they offered a logical foster care placement option. With a need for a new plan, these foster parents, who also had previously adopted J.H.'s half-sibling, started providing foster care for J.H.

At some point, the grandfather had a change of heart about abandoning consideration as an adoptive placement for his granddaughter. The juvenile court held a termination hearing in March 2019. The grandfather moved to intervene in the termination case and testified at the termination hearing that he would like to be considered as an adoptive placement. The court entered an order terminating the parents' rights in April. The court placed guardianship and custody of J.H. with DHS for adoptive placement. Shortly after termination, the foster parents also moved to intervene. Both motions to intervene were granted.

Now that the parents' rights were terminated and with two families interested, DHS began the process to determine who would adopt J.H. On April 30, DHS held an adoption selection staffing conference. Five individuals took part in the staffing: Wendy Markey, the child's case manager; Dawn Sage, Markey's supervisor; Kellianne Torres, the Family Risk, Safety, and Permanency services supervisor; Erica Troyna, the adoption case manager; and Tracy Wynn, the adoption supervisor. This committee separately interviewed the grandfather and the foster parents. Both the grandfather and the foster parents were asked a predetermined set of questions, and the committee members asked follow-up questions as necessary. The committee members were also given an optional matching tool to use if they needed help making their selection. After the

interviews, the committee members discussed their impressions. Then, each member emailed their vote for the adoptive family as well as their reasoning to a designated committee member who tallied the votes. The final committee vote was three in favor of the foster parents, one in favor of the grandfather, and one noting the choices were equal.

The committee's decision was reviewed by Judy Phelps, the social work administrator, and Phelps's direct supervisor, Dawn Turner, the service area manager. Neither Phelps nor Turner participated in the staffing, nor did they meet with either family. Phelps and Turner overruled the committee's recommendation and decided that the grandfather should be the adoptive placement for J.H. On May 21, the parties were notified that DHS selected the grandfather as the adoptive placement.

In July, DHS began moving the child from the foster parents' custody to the grandfather's custody. Around the same time, the foster parents moved to stay the custody transition and remove DHS as the child's guardian.

The court held a hearing on the foster parents' motion over three days, July 25, September 20, and October 18. After the first day of the hearing, the court issued an order for DHS to transition custody of the child back to the foster parents pending resolution of the motion to remove DHS as guardian. The grandfather filed, and the State joined, an interlocutory appeal challenging this order. The Iowa Supreme Court stayed the order and the child remained in the grandfather's custody pending final resolution of the district court proceedings. The case was sent back to the juvenile court on limited remand to resolve the guardianship issue.

On January 6, 2020, the juvenile court entered an order removing DHS as the guardian, placing guardianship with the foster parents for adoption, and transferring custody of the child to the foster parents. The Iowa Supreme Court then dismissed the interlocutory appeal as moot. The State and the grandfather filed notice of appeal and requested a stay of the district court's order pending final resolution of the appeal. One justice of the Iowa Supreme Court denied the stay, and this ruling was confirmed by a three-justice panel. The appeal now comes before our court for review.

## II.  Standard of Review.

We review "actions seeking to remove DHS as guardian and challenging custody placement" de novo. *In re S.O.*, No. 13-0740, 2013 WL 3458216, at *1 (Iowa Ct. App. July 10, 2013). "The court's core role in these proceedings is to ensure placement is in the best interests of the child." *Id.* We give weight to the juvenile court's findings of fact, but we are not bound by them. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014)*.*

## III.  Analysis.

After termination of the parents' rights to J.H., the juvenile court transferred the child's guardianship and custody to DHS under Iowa Code section 232.117(3) (2019) with the directive to move toward adoption.[2] Once guardianship is in place and adoption goals are set, the court and DHS have distinct roles. "When [the

---

[2] Iowa Code section 232.117(3) directs the juvenile court to transfer a child's guardianship and custody to one of the following upon termination: (1) DHS; (2) a placement agency or other suitable entity licensed to provide care; or (3) "a parent who does not have physical care of the child, other relative, or other suitable person."

legislature] gave the juvenile court authority to specify the child's best interests the legislature granted authority [to the juvenile court] to direct the *type* of placement the department [guardian] is to make. This authority does not empower the juvenile court to direct a *specific* placement," though the court had the power to monitor the placement. *In re C.D.P.*, 315 N.W.2d 731, 733 (Iowa 1982) (emphasis added); *accord In re E.G.*, 738 N.W.2d 653, 657 (Iowa Ct. App. 2007). But a court-appointed guardian may be removed by "an interested party or upon the court's own motion." Iowa Code § 232.118(1). And while there is no statutory criteria to reference for removal of a guardian, we have consistently "examined the reasonableness of the current guardian's actions and the best interests of the child." *In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016). "The juvenile court retains the authority to remove DHS as guardian if the department acts unreasonably or irresponsibly in discharging its duties." *S.O.*, 2013 WL 3458216, at *2.

Here, both the State and the grandfather argue that the district court erred by removing DHS as the guardian of the child. So we examine if DHS acted unreasonably or irresponsibly in discharging its duties and if the department also failed to look out for the J.H.'s best interests. *See In re I.P.*, No. 19-0715, 2019 WL 3317922, at *2 (Iowa Ct. App. July 24, 2019) ("Even if the DHS acted unreasonably in discharging its guardianship duties, we will not reflexively remove the DHS as guardian under section 232.118 if the removal is not in the child's best interests.")

After three days of testimony, the court found that DHS acted unreasonably by (1) ignoring the administrative code provisions on selecting an adoptive family

and (2) overruling the committee's selection and placing the child with the grandfather. We will address these claims in turn.

A. **The Process.** "When DHS is a child's guardian, it determines the specific adoptive home for the child." *In re T.J.M.*, No. 18-1390, 2018 WL 5840806, at *3 (Iowa Ct. App. Nov. 7, 2018). "When the DHS is chosen to provide adoptive services, it is vested, by statute, with the authority to adopt rules that govern the selection process and criteria, with the overriding goal of 'placing a child in a stable home environment as expeditiously as possible.'" *In re Adoption of J.B.H.*, No. 16-1308, 2017 WL 1735901, at *3 (Iowa Ct. App. May 3, 2017) (quoting Iowa Code § 600.7A). This selection criteria appears in the Iowa Administrative Code. *See* Iowa Admin. Code r. 441-200.4(3).

The administrative code defines "selection of family" as "reviewing approved home studies[3] to match a family's strengths with a specific child's needs." Iowa Admin. Code r. 441-200.1. As for the procedure to select an adoptive family, Iowa Administrative Code rule 441-200.4(3) provides,

> *Selection of family.* The family that can best meet the needs of the adoptive child shall be selected as follows:
> a. Before preplacement visits occur, a conference shall be held to select an approved family. A minimum of two department social workers and a department supervisor shall be included in the conference. The child's special needs, characteristics, and anticipated behaviors shall be reviewed in the conference to determine a family that can best meet the needs of the child. Approved families shall also be reviewed in an effort to match the specific family's parenting strengths with a particular child's needs.
> b. The following selection criteria shall be observed:

---

[3] "Adoptive home study" is defined as "an assessment of the family's parental attributes and a written report stating approval or nonapproval of the family for adoptive placement of a child or children." Iowa Admin. Code r. 441-200.1. And the department is to use the "PS-MAPP family profile format." Iowa Admin. Code r. 441-200.4(1)(d).

(1) Preference shall be given to placing children from the same birth family together. If placement together is not possible, or is not in the best interest of the children, the reasons shall be identified and documented in each child's case record. Efforts shall be made to ensure continuous contact between siblings when the siblings are not placed together.

. . . .

(3) A relative who is within the fourth degree of consanguinity shall be given consideration for selection as the adoptive family for a child who is legally available for adoption if the child has a significant relationship with the relative or the child is aged 14 or older and elects adoption by the relative.

(4) Foster parents shall be given consideration for selection as the adoptive family for a child in the foster parents' care who is legally available for adoption if the child has been in the foster parents' care for six months or longer or the child has a significant relationship with the family.

DHS's employee manual specifies that the purpose of the staffing conference is to "select an approved family that can best meet the child's needs." The manual mirrors the language of the rule, stating, "Siblings should be placed together unless there are compelling reasons (e.g. extreme violence) why this would not be in the best interests of the children involved." It continues, "If placing siblings together is not possible, or not in the best interest of the children, identify the reasons and document them in each child's record."

The State argues that the selection process outlined in the administrative code is not comprehensive and does not dictate who must make the *final* adoption decision. The State claims that the rule does not prevent each DHS service area from establishing internal procedures for selecting an adoptive family. In the State's view, the purpose of the selection staffing is to gather the facts for the social work administrator. Then, the committee's recommendations along with other

information, including the guardian ad litem (GAL) opinion,[4] is sent to the social work administrator to review. Under this internal procedure, this administrator, along with the service area manager, if necessary, makes the final decision. That said, the service area manager testified that, based on her understanding of the internal procedures, she can overrule the social work administrator's decision if she disagreed with it. This procedure was not a written, standardized statewide DHS procedure.

But administrative code directives are not aspirational. *See P.M. v. T.B.*, 907 N.W.2d 522, 535 (Iowa 2018) (noting that administrative "regulations enjoy a presumption of validity with the force of law"); *see also Davenport Cmty. Sch. Dist. v. Iowa Civil Rights Comm'n*, 277 N.W.2d 907, 909 (Iowa 1979) ("The valid rule of an authorized agency has the force and effect of law."). A "rule" means an "agency statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency." Iowa Code § 17A.2(11). The agency develops standards of operation for a reason. While the reasons supporting these rules are not developed in our record, the rules established must meet the administrative law purpose of "setting forth the nature and requirements of all formal and informal procedures available to the public . . . ." *Id.* § 17A.3(1)(b). And we do know this procedure requires a conference with at least three DHS staffers—two department social workers and a department supervisor—reviewing the child's special needs

---

[4] The GAL believed it was in the child's best interests for the foster parents to be the adoptive placement for the child. The service area manager could not recall if she evaluated any of the GAL's documentation and acknowledged she did not consult with the GAL.

and each potential adoptive family's parenting strengths. Iowa Admin. Code r. 441-200.4(3)(a). While the State and grandfather argue other internal informal procedures can apply, those procedures can be implemented if they "provid[e] greater protections to the public or confer[] additional rights upon the public." Iowa Code § 17A.1(2).

The unwritten unilateral negation of the committee's review by noncommittee members is an unreasonable action. It is difficult to understand how a paper review of the child's needs and the potential families' qualities constitutes the type of review envisioned by the procedure developed under the administrative rule.

The juvenile court determined that the added bureaucratic layer to the decision-making process was unreasonable. We agree. DHS is empowered to promulgate rules to govern adoptive family selection, which it did in rule 441-200.4(3). Built into the existing rules are interviews with the families, review of written adoption home studies, and an actual "conference" to review selection criteria and select an approved family. The unwritten, internal selection process used here was not authorized by statute, administrative rule, or by DHS's manual. Nothing prevents the social work administrator and the service area administrator from participating in a selection staffing conference. Likewise, no written rule permits them to overrule the selection committee's choice. We find DHS's selection process here was unreasonable because the administrative rule directs "a *conference shall* be held *to select an approved family*." Iowa Admin. Code r. 441-200.4(3)(a) (emphasis added). We reject the notion urged by the State, the grandfather, and the concurrence that the words "to select" mean nothing. If DHS

sanctioned a different process, its own rules codified in the administrative code should direct us accordingly.

**B. The Adoption Choice.** The difficulties for the district court did not end with the selection process. Three areas of concern arose: (1) lack of direct knowledge by the ultimate decision makers, (2) lack of appropriate weighting of mandated selection criteria, and (3) lack of analysis of the grandfather's motivation during the process. Yet the State and the grandfather argue that even if the process was unreasonable, the result was not unreasonable because the grandfather was a suitable adoptive placement. That said, the issue here is not whether selecting the grandfather was unreasonable, but whether the decision to overrule the committee's choice and place the child with the grandfather was unreasonable and against the child's best interests.

At the outset, we acknowledge that both the foster parents and the grandfather were seen as suitable placements for the child. By all accounts, selecting an adoptive family for J.H. was an extremely difficult decision. But the decision to overrule the committee vote selecting the foster parents was based on the grandfather's status as a relative within the fourth degree of consanguinity and the fact that, if placed with the grandfather, J.H. would grow up with extended family members.

That said, the testimony exposed factors making the decision to overrule the committee's selection of the foster parents unreasonable and not in the best interests of the child. First, the service area manager acknowledged that she did not consult with any of the members of the selection committee until after she and the social work administrator had decided to overrule the committee's decision.

She acknowledged they only considered the committee's written communication[5] and recommendation along with the some of the case review information. They did not personally interview either the foster parents or the grandfather and had no direct knowledge of the child's emotional bond with either the grandfather or the foster parents. During the hearing, the juvenile court addressed a deficiency in the process:

> THE COURT: Okay. All right. Now, the other question I have is this. You talked about—Miss Anderson-Seeber asked about how the [foster parents] had been providing day care for this child since the child was very very young. And you said, Well I don't know how much they provided. When you run into these kind of problems on this process that you go through, do you just say well I guess I don't know that answer so I just won't worry about it. See what I mean? Do you call people and talk to them and say hey, you know, I was reading through this and, you know, I came up with this question, what's the answer to this? Or what do you do?
>
> THE WITNESS: I could have. . . . The amount of child care provided wasn't something that was part of my decision.
>
> THE COURT: So the fact that—I mean I don't know what—I don't personally know off the top of my head how much they provided, but I mean if this child was with the [foster parents] for 8 to 10 hours a day five days a week for the first seven months of its life, that might very well be more time than when [grandfather] had the child at night when he was at home. Right?
>
> THE WITNESS: Possibly yes.
>
> THE COURT: Okay. So you didn't really answer that. You didn't go find the answer to that question.
>
> THE WITNESS: I did not.
>
> THE COURT: Okay. And I'm just saying that that's the problem—that's the—a danger in reviewing how you do without having the information.

The juvenile court found the staffing selection committee followed the rules, made the process transparent, and trumped the unwritten loose process involved here.

---

[5] Some staffing members testified they used a DHS matching tool to weight the differences between the family choices and, although Phelps knew at least one person had used it, she revealed she did not read any of these.

Thus the juvenile court ruled, with no authority to overrule the adoption selection conference, the actions were unreasonable.

Next the juvenile court addressed the supervisors' application of the written selection criteria they used to overrule the conference vote. *See* Iowa Admin. Code r. 441-200.4(3)(b). The words used in rule 441-200.4(3)(b) reflect a hierarchy within the criteria. "*Preference* shall be given to placing children from the same birth family together" while "[a] relative who is within the fourth degree of consanguinity shall be given *consideration*" Iowa Admin. Code r. 441–200.4(3)(b)(1), (3) (emphasis added). And foster parents having a significant relationship with the child "shall also be given *consideration*" under the criteria. Iowa Admin. Code r. 441–200.4(3)(b)(4) (emphasis added). Preference is "[t]he favoring of one person or thing over another"; where consideration is "something that may be taken into account when forming an opinion." *See Preference* and *Consideration*, *Black's Law Dictionary* (11th ed. 2019). So the administrative rule gave both prospective adoptive families consideration, with the foster family having a preference because of the placement of J.H. in the home with the half-sibling. *See* Iowa Admin. Code r. 441-200.4(3)(b)(1), (3). The adoptive family selection rule did not favor the grandfather over the foster parents.

Despite both families having equal consideration under the rules, the social work administrator and the service area manager found consideration of the grandfather outweighed consideration of the foster parents. This was in large part because of the possibility that the child would grow up around extended family. Yet the grandfather's children were both adults and did not live in the home, and his son, J.H.'s father, had unresolved substance-abuse concerns that led to the

termination of his parental rights. The grandfather also had other grandchildren, J.H.'s half-siblings, but he had not seen those grandchildren in over a year and he had not tried to set up any visits between those children and J.H.

In contrast, J.H.'s half-sibling adopted by the foster parents was close in age to her. Being placed with the foster family would allow J.H. to grow up having a close relationship with this child. The foster parents testified about their desire to maintain ongoing contact with J.H.'s extended family, including the two other young half-siblings. Placing the child with the foster parents would further the statutory and DHS policy of keeping siblings together. *See, e.g.*, Iowa Code § 232.108(1). The testimony of the committee members confirmed that the three voting for placement with the foster parents tracked the preference requirement for placing siblings together. Yet when asked about how the preference applied under the criteria, Phelps answered:

> Q. And is it not true that the Iowa Administrative Code provides—and I believe probably even your manual—that preference shall be given to placing children from the same birth family together?
> A. That's one of the criteria, as well as with adult relatives, adult relative caregivers.
> Q. Okay. And is it your opinion that one should be placed above the other?
> A. No. I don't think you can say there's a hierarchy or a checklist or any of that. It's all individualized depending on the circumstances.

She further noted that she understood the sibling preference to apply to an adoption where children from the same birth family were adopted together. Here the foster family had already adopted the half-sibling. So Phelps opined, "The way I interpret that is if we remove three kids from this home and take them out of that home, they should all be placed together." The juvenile court found the selection

committee, as opposed to the supervisors, correctly applied the preference, adding to the unreasonableness of the final decision.

Finally, the grandfather's motivations troubled the juvenile court. It is unclear what weight, if any, the social work administrator and service area manager gave to the grandfather's decision to relinquish custody of the child during the CINA case. The juvenile court found that the grandfather's earlier decision to relinquish custody of the child "in the hopes that if [J.H.] were placed in foster care, that his son would work harder toward regaining custody of his [child]" casts doubt on whether the grandfather would be able "to continually make decisions that will be in the best interests of [the child]." The court, assigned to this case since the beginning of the CINA proceedings, noted that J.H.'s father never made any serious efforts to participate in services or regain custody of his child and found the grandfather's choice to place J.H. "into foster care to motivate his son [was] an extraordinarily poor [choice]."

Likewise this concern was compounded by the fact that at the time of the adoption selection staffing conference, the grandfather had not completed the required classes or home study to be licensed as an adoptive placement for the child. He did not complete the classes until October 2019 and did not have an approved home study until November. While DHS witnesses at the hearing testified DHS will sometimes place a child in a prospective adoptive home before the family is licensed, here, the foster parents were licensed and approved to adopt the child when DHS chose an adoptive family while the grandfather was not. But again, the administrative rules note that for "applicants who apply to the department to adopt, the recruitment and retention contractor *shall* prepare an

adoptive home study." Iowa Admin. Code r. 441-200.4(1). No such document evaluating the grandfather existed during the critical selection process. The juvenile court found the grandfather's lack of participation in the adoption study to be part of his ongoing effort to motivate his son. The supervisors' lack of in-depth consideration of the criteria and history of the grandfather's care augmented the court's finding that DHS acted unreasonably.

In contrast, the foster parents consistently pursued the desire to be the adoptive placement for the child should her parents' rights be terminated. The court found that the foster parents "have consistently and continually acted in the child's best interests."

For the reasons stated above, we find the unilateral change of the adoption selection committee decision was unreasonable under the circumstances. We find that based on the facts here, it was unreasonable and not in the child's best interest to overrule the selection committee's vote for the foster parents. The foster parents have proved the criteria to remove DHS as the guardian for this child.

**IV. Disposition.**

We affirm the juvenile court order granting the foster parent's motion to modify disposition and removing DHS as the child's guardian.

**AFFIRMED.**

Bower, C.J., concurs; Ahlers, J., concurs specially.

**AHLERS, Judge** (specially concurring).

Although I concur in the outcome, I write separately for two reasons. First, I disagree with the conclusion the Iowa Department of Human Services (DHS) followed an improper procedure because I do not believe the regulation at issue gives binding decision-making authority to the persons selected to participate in the conference required by the regulation. Second, I believe it is important to emphasize that the DHS's failure to give proper preference to the child being placed with the child's half-sibling is the key factor in deciding to remove the DHS as guardian.

### I. Procedural Basis.

Turning to the first reason, I believe it is natural to have a knee-jerk reaction to dislike the procedure followed by the DHS in having a supervisor override the consensus of the persons involved in the conference required by the regulation at issue. *See* Iowa Admin. Code r. 441-200.4(3)(a). After all, who doesn't prefer a majority vote of a well-informed group over the decision of one or two people who didn't attend the conference? But this reaction is justified only if the regulation is viewed as requiring the conference participants to serve as the decision-makers. I am not convinced the regulation requires that conclusion.

First, all the regulation really says on the topic of the power of the conference participants is "a conference shall be held to select an approved family." *Id.* It references a "conference"[6] being held, not a decision-making body

---

[6] A "conference" is "*a meeting* of two or more persons for discussing matters of common concern." *Conference*, Merriam-Webster, https://www.merriam-webster.com/dictionary/conference (last visited May 11, 2020) (emphasis added).

being formed. The fact the regulation references an event (i.e., a conference) and not a body (e.g., a committee) supports a conclusion that the regulation merely directs a fact-gathering process and not the assembly of a decision-making body. In this case, a conference was in fact held, and the participants in the conference gathered the required information. If the regulation is viewed as simply requiring a group to gather information, there was compliance. Nowhere does the regulation say the conference participants then have binding decision-making authority, nor does it prohibit the ultimate decision being made by someone higher up the chain of command, as was done in this case. *See id.* If the regulation is viewed in this light, I do not believe the courts have the authority to trump the process followed by the agency when the agency violated no regulation or written internal operating rules in making its decision, regardless of whether we are pleased with how well the ultimate decision makers reviewed the gathered facts. *See In re T.J.M.*, No. 18-1390, 2018 WL 5840806, at \*5 (Iowa Ct. App. Nov. 7, 2018) (noting disagreement with the process by which the DHS made its decision is not a basis for removal of the DHS as guardian).

Second, even if we were to conclude the regulation somehow made the selected conference participants a decision-making body with ultimate decision-making authority, the regulation does not say how that decision is made. Is it by unanimous vote? Majority vote? A two-thirds majority? What if there is a tie vote? The fact that none of these questions are answered or even referenced in the regulation supports the conclusion that the conference is designed as a fact-gathering tool and not a decision-making body.

Having concluded the regulation merely requires a fact-gathering conference to occur, I see no violation of the regulation in how the DHS reached its decision in this case. Therefore, I see no error in the procedure followed by the DHS in this case, and the DHS should not have been removed as the child's guardian on that basis.

## II. Substantive Basis.

To me, the more difficult issue to decide is whether the DHS failed to fulfill its duties as the child's guardian in choosing the adoptive family. To resolve this issue, it is helpful to review the standards to apply in deciding whether to grant a request pursuant to Iowa Code section 232.118(1) (2019) to remove a guardian appointed for a child following the termination of the parental rights of the parents of the child. As the majority correctly notes, this is not as easy as it sounds, as the statute itself provides little guidance. Determining the standards involves reviewing case law interpreting the statute.

In articulating the standards to apply, it may be helpful to start by articulating what the standards are not. Review of the case law and statutory authority on this issue reveals the following:

**(1)    The juvenile court is not allowed to treat situations such as this as a custody battle between the competing families.**  Since this case boils down to a dispute between two prospective adoptive families, it may be easy to view this as a custody battle between the two families and view the court's role as determining which family would be the better placement following a "best-interest-of-the-child" standard such as would be applied in a dissolution of marriage context. *E.g., In re Marriage of Decker*, 666 N.W.2d 175, 176–80 (Iowa Ct. App.

2003) (in a dissolution action, considering the best interest of the children and placing the children with the mother). It is true that, in ruling upon an application to remove the DHS as guardian, the court's core role is to ensure placement is in the best interest of the child. *See, e.g.*, *In re D.H.*, No. 12-1387, 2012 WL 5954633, at *2 (Iowa Ct. App. Nov. 29, 2012); *In re E.G.* (*E.G. I*), 738 N.W.2d 653, 656 (Iowa Ct. App. 2007). However, a fair reading of the case law does not support a conclusion that consideration of the "best-interest-of-the-child" standard in the context of a request to remove the DHS is the same consideration of the "best-interest-of-the-child" standard that is applied in the context of a custody battle in a divorce action where the court is charged with determining which parent would be the better placement for a child. *Compare In re Marriage of Rodgers*, 470 N.W.2d 43, 45 (Iowa Ct. App. 1991) (in a dissolution action, finding "it would be in the children's best interest to continue in [the father's] care"), *with In re E.G.* (*E.G. II*), 745 N.W.2d 741, 744 (Iowa Ct. App. 2007) (in an action to terminate the DHS's guardianship, finding "in this case, there is not only one, but two, [placements] that would be in [the child's] best interests").

In terms of the court's involvement in ruling on the application to remove the DHS, this is not a custody battle between the two competing parties. The juvenile court is not permitted to make its own independent decision as to which family the child should be placed with for adoption. That duty lies with the DHS, as the guardian of the child. In *E.G. I*, we held that "[t]he legislature, while giving the juvenile court continuing oversight consistent with the best interest of the child, did not give the juvenile court the right to establish custody or consent to adoption." 738 N.W.2d at 657. "Rather, these rights were specifically granted to the

guardian," which is the DHS in this case. *Id.* The appointed guardian, not the juvenile court, is responsible for making important decisions that have a permanent effect on the life and development of the child and promoting the general welfare of the child. *In re J.T.*, No. 11-1940, 2012 WL 836845, at *2 (Iowa Ct. App. Mar. 14, 2012).

**(2)    The role of the juvenile court is not to do a de novo review of the DHS's decision based on the information available to the DHS.** Again, this is not a custody battle, and the juvenile court does not sit in essentially an appellate role to review the DHS decision. The authority to make the decision as to placement of the child belongs to the guardian of the child, which here is the DHS. *See id.* The DHS has expertise in making difficult decisions between two highly capable homes. *See id.*

**(3)    The juvenile court does not have veto power over the DHS's decision.** The court is not permitted to remove the DHS as guardian and custodian simply because it would have reached a different decision had the court been vested with the authority and obligation to make a decision between the competing families. *See, e.g.*, *E.G. I*, 738 N.W.2d at 657. To do so would be an improper usurpation of the role of the DHS as guardian and custodian of the child. While the DHS functions as the child's guardian, the juvenile court has the authority to specify the *type* of placement the DHS is to make, but the court does not have the authority to direct a *specific* placement. *See id.*; *see also In re S.O.*, No. 13-0740, 2013 WL 3458216, at *2 (Iowa Ct. App. July 10, 2013) ("It is DHS's duty and right . . . to choose the placement for these children.").

Having articulated what the standards are not, it is still necessary to articulate what the standards are. Based on the case law addressing this issue, I believe the standards can be distilled into the following statement:

> An applicant seeking to have a court-appointed guardian of a child removed pursuant to Iowa Code section 232.118(1) has the burden of establishing the court-appointed guardian failed to act in the child's best interest by unreasonably or irresponsibly failing to discharge the guardian's duties in finding a suitable adoptive home for the child.[7]

*See In re I.P.*, No. 19-0715, 2019 WL 3317922, at *2 (Iowa Ct. App. July 24, 2019) ("Even if the DHS acted unreasonably in discharging its guardianship duties, we will not reflexively remove the DHS as guardian under section 232.118 if the removal is not in the child's best interests."); *In re W.L.*, No. 19-0424, 2019 WL 2375248, at *3 (Iowa Ct. App. June 5, 2019) (same); *T.J.M.*, 2018 WL 5840806, at *3 ("In considering whether DHS should be removed as the guardian of a child, we have looked at whether it has engaged in 'unreasonable actions.' We have also looked at whether 'the [DHS] in any way failed in its guardianship duties or in looking out for [the child's] best interests.'" (citations omitted)); *In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016) ("In the absence of statutory criteria, this court has examined the reasonableness of the current guardian's actions and the best interests of the child."); *In re R.S.*, No. 15-1244, 2015 WL 5578273, at *2 (Iowa Ct. App. Sept. 23, 2015) (affirming the juvenile court decision to deny a request to remove the DHS as guardian, finding the DHS's "action was reasonable, responsible, and in the child's best interests"); *S.O.*, 2013 WL 3458216, at *2

---

[7] I use this single-spaced format purely for emphasis. To be clear, the emphasized statement is not a quote from any source, but is my best effort to state the standard that can be gleaned from the cited case law addressing the issue.

(stating the juvenile court retains the authority to remove the DHS as guardian only if the DHS "acts unreasonably or irresponsibly in discharging its duties"); *D.H.*, 2012 WL 5954633, at \*4 (affirming the juvenile court decision to deny a request to remove the DHS as guardian after concluding the "DHS did not act unreasonably in carrying out its duties as guardian" and noting the DHS had the "duty and right to choose the placement"); *In re K.M.H.*, No. 12-1300, 2012 WL 5562784, at \*2 (Iowa Ct. App. Nov. 15, 2012) (affirming the juvenile court decision to deny a request to remove the DHS as guardian after concluding the DHS acted in the children's best interests); *J.T.*, 2012 WL 836845, at \*2 (affirming the appointment of the DHS as guardian after finding that the DHS did not err in its pre-adoptive placement decision given "the difficulty in deciding between two highly capable homes"); *In re D.H.*, No. 10-1313, 2010 WL 4484849, at \*6 (Iowa Ct. App. Nov. 10, 2010) (affirming the juvenile court decision to not remove the DHS as guardian after concluding there was no evidence the DHS "in any way failed in looking out for the child's best interests," even though a prospective adoptive family and the guardian ad litem disagreed with the DHS's decision); *E.G. II*, 745 N.W.2d at 744 (reversing the juvenile court for removing the DHS as guardian, finding no proof of any unreasonable actions on the part of the DHS after it "conducted an extensive adoption work-up, which resulted in finding a 'highly qualified' adoption home"); *E.G. I*, 738 N.W.2d at 657 (reversing the juvenile court for making decisions with respect to custody and adoption, finding those decisions to have been statutorily given to the DHS, as guardian).

Applying these standards, my initial inclination is to focus on the fact the parties essentially acknowledged both placement options were suitable.

Ordinarily, this would end the inquiry and require deference to the DHS; such an outcome here would result in reversal of the juvenile court, as acknowledging the DHS found a suitable placement option would be tantamount to acknowledging the DHS had not unreasonably or irresponsibly failed to discharge its duties in finding a suitable adoptive home for the child.

In this case, however, there is a key detail that I believe changes the outcome. That key detail is the fact the foster parents previously adopted the child's half-sibling. This fact creates a statutory and regulatory preference in favor of placement with the foster parents. *See* Iowa Code § 232.108(1) (requiring the DHS to "make a reasonable effort to place the child and siblings together in the same placement"); Iowa Admin. Code r. 441-200.4(3)(b)(1) (requiring preference to "be given to placing children from the same birth family together"); *see also* Iowa Code § 232.2(52) (defining "sibling" as "an individual who is related to another individual by blood, adoption, or affinity through a common legal or biological parent"). The juvenile court found, and I agree, this preference was largely ignored in the ultimate decision made by the DHS to place the child with the grandfather.[8]

---

[8] The fact the regulation requires "consideration" to be given to the grandfather as a relative within the fourth degree of consanguinity is largely inconsequential, as the regulation also requires "consideration" to be given to the foster family due to the child having been in their care for six months or longer. *See* Iowa Admin. Code r. 441-200.4(3)(b)(3), (4). Besides the fact the competing "considerations" of the grandfather and the foster parents are essentially a regulatory wash, neither of these "considerations" overcome the "preference" in favor of the foster parents. As the majority correctly notes, a preference is "[t]he favoring of one person or thing over another" where consideration is merely "[s]omething that may be taken into account when forming an opinion." *See Preference* and *Consideration*, *Black's Law Dictionary* (11th ed. 2019).

The failure to properly honor the preference,[9] coupled with the other factors noted by the juvenile court and the majority (e.g., the grandfather's decision to relinquish custody of the child earlier in the case, the grandfather's failure to diligently complete the requirements to be considered a lawful adoptive placement for the child, and the foster family's continual and consistent efforts to be a viable placement option), causes me to conclude the DHS acted unreasonably in failing to discharge its duties in finding a suitable adoptive home for the child.

On these bases, I join in affirming the juvenile court's decision to remove the DHS as guardian of the child.

---

[9] The juvenile court, which "has the benefit of having been involved in this case from the outset," found the grandfather's claim that he would continue a relationship with the foster family was not credible, while the foster family has "consistently and continually acted in the child's best interests."