# IN THE COURT OF APPEALS OF IOWA

No. 24-1271
Filed December 4, 2024

**IN THE INTEREST OF G.G.,**
**Minor Child,**

**R.G., Mother,**
    **Appellant.**
_____

Appeal from the Iowa District Court for Keokuk County, Patrick McAvan,

Judge.

A mother appeals the removal, adjudicatory, and dispositional orders

arising from allegations of medical child abuse. **AFFIRMED.**

Denise McKelvie Gonyea of McKelvie Law Office, Grinnell, for appellant

mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney

General, for appellee State.

Rebecca L. Petig of Bierman & Petig, P.C., Grinnell, guardian ad litem for

minor child.

Katie Mitchell of Mitchell Law Office, PLC, Washington, attorney for minor

child.

Considered by Greer, P.J., and Ahlers and Badding, JJ.

**BADDING, Judge.**

After reviewing thousands of pages of medical records, a medical team at a child protection center determined that a child, who is now seventeen years old, was the victim of medical child abuse by her mother. The mother appeals the removal, adjudicatory, and dispositional orders that followed.[1] We affirm, finding the statutory requirements for adjudicating the child as in need of assistance were met, and the juvenile court made "the least restrictive disposition appropriate considering all the circumstances of the case." Iowa Code § 232.99(4) (2023).

## I. Background Facts and Proceedings

Since G.G. was born in 2007, she has been in and out of doctors' offices, clinics, and hospitals. In April 2023, a child protective worker from the Iowa Department of Health and Human Services visited the home on an unrelated matter and noticed medical equipment in the child's bedroom. G.G. told the worker that she had suffered from medical problems her whole life, but neither she nor her mother wanted to talk about it. The mother oversaw the child's medical care, while the father supported the family financially and attended major appointments. The worker learned the mother wanted to get a wheelchair for G.G., but when he spoke to the child outside her home, she "hopped up on the trailer" of a truck. After visiting the home, the worker talked to some of G.G.'s past and present medical providers, some of whom expressed concern about the mother seeking out unnecessary medical treatment for the child.[2]

---

[1] The father has had custody of the child since before adjudication and does not appeal.

[2] Despite their concern, only one other report was made about G.G.'s care. That report came in 2020 and was not confirmed after investigation by the department.

The child protective worker then consulted Dr. Regina Torson, the medical director of a child protection center, about the possibility that G.G. was the victim of medical child abuse. According to Dr. Torson, medical child abuse

> occurs when false information is provided to medical professionals which in turn leads to medical treatment that is unnecessary. Medical treatment can include prescription medications, lab studies, radiology studies, medical procedures, surgeries and other treatments like physical therapy, occupational therapy, and speech therapy. Medical Child Abuse is a serious form of abuse because medical treatments, especially ones that are not necessary, can lead to harm. For example, medications can have significant side effects, medical procedures can have serious complications including death and finally, the mental health of a victim of Medical Child Abuse can be significantly affected.

Dr. Torson explained medical child abuse is the flip side of factitious disorder imposed on another, formerly known as Munchausen Syndrome by Proxy: "Factitious disorder focuses on the perpetrator. Medical child abuse focuses on the victim." Because Dr. Torson had not examined the mother, she would not diagnose her with factitious disorder imposed on another. But she did diagnose G.G. as the victim of medical child abuse. Dr. Torson had reached that diagnosis only five times in her twenty years at the child protective center, where she had seen over 9000 children.

Starting from the child's birth, Dr. Torson and her medical team reviewed at least 10,000 pages of medical records from hospitals across the Midwest, identifying conditions reported by the mother that were not supported by the records. Some providers over the years expressed confusion that G.G. was "growing and developing as expected," and she would eat normally in the hospital, even though the mother was reporting G.G. was "really not eating and drinking." While G.G. has some confirmed, chronic health problems that require ongoing

treatment, the medical records showed unnecessarily invasive treatments,[3] repeated testing, and conflicting or false reports to various providers. The false reports included claims that the child had been born prematurely and suffered recurring urinary tract infections, dehydration, thyroid failure, and a genetic disease that had been ruled out by other providers. The inaccurate reports resulted in unnecessary or ineffective tests, procedures, medications, and treatments.[4] The medical team's report observed the child "may now also be complicit with providing false information." By spring 2023, the child's medication list had more than two dozen entries; some were taken as needed and others prescribed for daily use, but a review showed G.G. was not actually taking all the medications.

As an example of the mother's false reporting, in late 2017 the mother told a medical provider that G.G. had "thyroid failure" after an abnormal lab result, even though the reviewing doctor indicated no treatment was necessary but should be checked in a few months. A month later, an MRI was performed checking for hypothyroidism, which came back normal, yet the mother reported hypothyroidism or thyroid disease at a different hospital several months later. That doctor noted, "Her prior thyroid studies . . . were not that concerning" and clinically normal. Then, three years later, another note showed concerns of thyroid dysfunction. So testing of the thyroid hormones was ordered, which again came back normal.

---

[3] Some of those treatments included the use of an NG feeding tube; placement of a permanent port for IV liquids; insertion of a suprapubic catheter; and an ostomy bag. The mother also advocated for other treatments that doctors refused, like a G tube.

[4] The child protection worker did acknowledge that while perhaps not necessary, none of the procedures were performed against medical advice.

Dr. Torson concluded, "it just follows the pattern of information being presented to a medical provider that's not accurate so further things happen."

The child was removed from the parents' custody in August and placed with fictive kin. In January 2024, the juvenile court returned custody of G.G. to the father; the parents had separated, and the mother moved to a different home. While the father could make medical decisions for G.G., the mother was barred from participating in those decisions or providing medical history to professionals. After removal from the mother, G.G. was weaned off some medications, stopped using a feeding tube, did not need a wheelchair or nutrition supplements, and generally exhibited improved overall health. She also reengaged physical therapy after six months of missed appointments and increased the frequency of her mental-health therapy. G.G.'s school attendance and grades improved, and she worked at a part-time job. The expressed goal of the department at adjudication was for G.G. and the mother to "have a relationship but that [G.G.] receive[] medical treatment in an appropriate way without any improper influence."

The mother started mental-health therapy and mostly attended her appointments. She went to all supervised visits with G.G., which went well, and the dispositional order approved additional visits supervised by the father. While the mother has access to G.G.'s medical information, she has not attempted to interfere with any appointments or engage with G.G.'s medical providers. The mother testified at the adjudication hearing, explaining her perspective of G.G.'s life-long health issues and the reasons behind the challenged medical procedures, each of which she thought were necessary and recommended by the treating doctors. But portions of her testimony showed that she continued to misconstrue

some of G.G.'s conditions and appropriate treatment steps. For example, the mother still says the child has Ehlers-Danlos syndrome, a genetic hypermobility condition—which testing has ruled out—and wants G.G. to go to a specialist found in a support group rather than pursuing treatments with her current providers and their associates. And at the dispositional hearing, although G.G.'s medical interventions had decreased and she was doing well, the mother maintained, "as far as I can see, things really haven't changed." The mother maintains this position on her appeal from the juvenile court's removal, adjudicatory, and dispositional orders.

## II.  Standard of Review

We review child-in-need-of-assistance proceedings de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). We give weight to the fact findings of the juvenile court, but we are not bound by them. *Id.* Determining a child is in need of assistance "must be based upon clear and convincing evidence." *Id.* at 41.

## III.  Analysis

We recognize that "[n]ormally, there is no justification for the State's interference in the private relations of a family or for the State's examination of the judgment of parents in making decisions concerning the well being of their children." *In re K.M.*, 653 N.W.2d 602, 607 (Iowa 2002). But we also consider the State's duty to ensure "that every child within its borders receives proper care and treatment" and to intercede if the parents fail to provide the needed care. *In re A.M.*, 856 N.W.2d 365, 376 (Iowa 2014) (citation omitted). Our most important consideration is the best interests of the child. *J.S.*, 846 N.W.2d at 40.

**A.** **Waiver.** At the outset, the State argues the mother failed to produce the transcript from the fourth day of the combined removal and adjudication hearing, and so she waived her challenges to the removal and adjudication of the child. From our review of the transcripts before us, and the juvenile court's adjudicatory order, it appears that the fourth day of the hearing included testimony from the mother, the maternal grandmother, the father, and possibly the child.

The rules of appellate procedure require the appellant "include a transcript of all evidence relevant to" any conclusion unsupported by the evidence. Iowa R. App. P. 6.803(1); *see In re K.D.*, No. 22-1278, 2022 WL 5067117, at *1 (Iowa Ct. App. Oct. 5, 2022). But the supreme court has observed, "The entire transcript is not required if the record is sufficiently complete to permit full and fair appellate review." *In re T.V.*, 563 N.W.2d 612, 614 (Iowa 1997); *accord In re T.S.*, No. 24-0981, 2024 WL 3887445, at *4 (Iowa Ct. App. Aug. 21, 2024). Here, the State's presentation of evidence is transcribed in full; it is the transcript of part of the mother's (and the father's) case which we do not have. For the missing day of transcript, we have the information provided in the adjudication order summarizing the testimony of the witnesses. And we have more than five hundred pages of exhibits, plus reports from the department, family-centered services, and other providers. So, while we do not condone the mother's failure to order the full transcript, we find the record is sufficient to review her challenges on appeal.

**B.** **Removal.** The mother first claims the juvenile court erred in "authorizing the initial and continued removal of the child." "Because the initial removal and continued removal at the time of adjudication cannot now be remedied, whether those decisions were correct is moot and we do not address

them." *In re L.H.*, No. 19-0931, 2019 WL 5063336, at *3 (Iowa Ct. App. Oct. 9, 2019); *accord In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994). Our review will thus be confined to the mother's challenge to the child's continued removal from her custody at disposition, which we will discuss after examining the statutory grounds for the child's adjudication.

**C.** **Statutory Requirements for Adjudication.** The child was adjudicated in need of assistance under Iowa Code section 232.96A(2), (3)(b), and (5). The mother asserts none of these grounds were proven by clear and convincing evidence. Generally, we address all grounds for adjudication, as they "have important legal implications beyond the adjudication," including affecting the disposition of the case. *In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995); *accord J.S.*, 846 N.W.2d at 41.

The grounds on which the juvenile court adjudicated G.G. as a child in need of assistance provide:[5]

> (2) The child's parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to physically abuse or neglect the child.
> (3)(b) The child has suffered or is imminently likely to suffer harmful effects as a result of any of the following: . . . The failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.
> . . . .
> (5) The child is in need of medical treatment to cure, alleviate, or prevent serious physical injury or illness and whose parent, guardian, or custodian is unwilling or unable to provide such treatment.

---

[5] The court rejected two other grounds alleged by the State for adjudication: (6) mental illness or emotional damage; and (14) parent's mental condition or substance use problem results in inadequate care.

Iowa Code § 232.96A.

For chapter 232, "neglect" means failure "to provide for adequate food, shelter, clothing, medical or mental health treatment, supervision, or other care necessary for the child's health and welfare," while "physical abuse" means "nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent." *Id.* § 232.2(40), (48). Although chapter 232 does not define "harmful effects," our supreme court has said that it includes "harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur." *J.S.*, 846 N.W.2d at 41–42 (interpreting the former version of section 232.96A(3)(b)). This court has found that "fabrication" or "exaggeration" of symptoms and failure to follow medical advice can demonstrate the imminent neglect or abuse and failure to supervise that is needed to sustain an adjudication under the precursors to paragraphs (2) and (3)(b). *In re L.F.*, No. 17-0818, 2017 WL 3079885, at *1 (Iowa Ct. App. July 19, 2017). We have also found failure to provide recommended treatments in the face of parent-preferred but less effective treatments, or based on selective reading of the risks and rewards of the recommended treatments, constituted clear and convincing evidence for adjudication under paragraph (5). *In re V.G.*, 995 N.W.2d 530, 539 (Iowa Ct. App. 2023).

In a comprehensive ruling, the juvenile court found paragraphs (2) and (3)(b) were met from "the sheer number of times" the mother "shared inaccurate, misleading, or incomplete medical history with doctors attempting to provide medical care." While the doctors the mother sought out performed the "questionable or unnecessary" procedures, it was based on the misleading history

provided by the mother. The court determined G.G. remained at "imminent risk of future harm" until the reason the mother provided inaccurate information was known, and they could rebuild trust in her reporting. On paragraph (5), the juvenile court noted the mother's active role in G.G.'s medical care, which tended to "attempt to tip the scales in favor of more immediate, though more invasive, interventions." The court found it clear that her actions did not result in G.G. receiving appropriate medical treatment.

The mother addresses all three grounds together. She focuses on the fact that medical professionals evaluated G.G. for her various treatments, they prescribed and authorized them, and several treatments "were not medically necessary" but were intended to improve her daily life. At best, the record shows that the mother resisted some of the longer-term therapies recommended by G.G.'s doctors in favor of more immediate and aggressive treatments to address the child's discomfort. The mother's efforts, and reporting of information to obtain those treatments, unnecessarily escalated the interventions G.G. received so that now, as Dr. Torson explained, "we just don't even really know where [G.G] could be or can get to right now" because "there's just been so much clouded information and lack of appropriate treatment in some situations."

For example, the mother insisted on putting in an NG feeding tube—which Dr. Torson said is "an invasive procedure" that "hurts to put in"—rather than developing sustainable ways for G.G. to consistently meet her nutritional needs through food and drink. The child's gastroenterologist, according to Dr. Torson's review of the medical records, "had set out a plan for [G.G.] to not have the NG tube in for feeding. She had [G.G.] eat at her clinic to show that [G.G.]—that she

could eat." Yet the mother moved forward with the feeding tube, which she then reported to other doctors that G.G. was dependent upon, even though G.G. stopped using it without any problems after her removal from the mother's care. As another example, before G.G.'s ostomy, the mother would bring her to providers reporting that G.G. had not had a bowel movement for weeks—even though she was taking "up to twelve capfuls of MiraLAX, ten ounces of magnesium citrate, Ex-Lax, and a suppository." Dr. Torson explained "twelve caps of MiraLAX is an extraordinary amount of medicine, plus milk of magnesia and a suppository": "I just don't know that you could give a person that much. Second of all, how would they not poop with that much, especially if their colon is normal?"[6] And G.G.'s colon was normal. The mother's reporting led to G.G. undergoing multiple x-rays, regular "clean-outs" at the hospital with a medication typically used for colonoscopies, and the ostomy. Because of these, and other reports by the mother, Dr. Torson testified that G.G. was at risk of dying "from treatment perpetuated by" her mother.

We agree with the juvenile court that clear and convincing evidence shows the mother's inaccurate statements to providers caused the child to undergo unnecessary procedures and long-term interventions, with fragmented care across different hospitals. *See L.F.*, 2017 WL 3079885, at *2–3. We also agree that the mother is unable to provide appropriate, necessary treatment as shown in the

---

[6] A typical dose for a child was one cap, dissolved in "four to eight ounces of liquid," which was usually effective, according to Dr. Torson: "MiraLAX is a very good laxative. . . . I do see a lot of kids with constipation, and typically, if we give them one cap daily, that's plenty. Sometimes you even have to . . . back off it because they get diarrhea."

mother's inconsistent medication management, skipping physical therapy appointments while seeking other medical intervention, and seeking retesting of ruled-out issues. *See V.G.*, 995 N.W.2d at 539. We accordingly affirm the juvenile court's ruling adjudicating G.G. a child in need of assistance under section 232.96A(2), (3)(b), and (5).

**D. Dispositional Order.** Following a dispositional hearing, "the court shall make the least restrictive disposition appropriate considering all the circumstances of the case." Iowa Code § 232.99(4). "The dispositions available to the court include suspended judgment, retention of custody by a parent, appointment of a guardian, and transfer of legal custody of child and placement." *In re A.C.*, No. 24-0435, 2024 WL 2842230, at *2 (Iowa Ct. App. June 5, 2024); *accord* Iowa Code §§ 232.99(4), .100, .101, .101A, .102.

The juvenile court found the "least restrictive alternative available, appropriate and in the best interests of the child is that legal custody of the child be allowed to remain with her father . . . with the Department to monitor placement." The court reasoned, "Until there is understanding by [G.G.] that she has undergone unnecessary interventions due to her mother's failure to accurately report her history, and there is an understanding as to why [the mother] engaged in this behavior, the imminent risk to [G.G.'s] health remains high."

The mother urges that any issues putting the child at risk of harm were resolved by the dispositional hearing and that "there is no continuing risk to justify continued removal." In support of this argument, she points out that the medical providers have reviewed and assessed G.G.'s medical services, meeting the original purpose of the adjudicatory order.

The mother is correct that a significant step began between adjudication and disposition—the implementation of a monthly medical staff meeting with medical providers, department workers, the child's attorney and guardian ad litem, G.G., and her father to manage G.G.'s medical care as a whole. As her guardian ad litem observed, the meetings "are insightful and give [G.G.] a chance to grow into an independent decisions maker regarding her health care choices." Interjecting the mother—who does not recognize any problem with the child's past medical care or acknowledge any change in her physical health since removal—back into a position where she could influence G.G.'s medical decisions would hamstring the work the department and the medical team has put into understanding and coordinating G.G.'s care. *See A.C.*, 2024 WL 2842230, at *2 (finding it necessary "that the parents acknowledge and recognize the abuse before any meaningful change can occur" (citation omitted)). The juvenile court's dispositional order balances the need to protect G.G.'s mental and physical health and develop her ability to make medical decisions for herself with the mother and daughter's desire for increased time together.

For these reasons, we affirm the juvenile court's adjudicatory and dispositional orders.

**AFFIRMED.**