**IN THE COURT OF APPEALS OF IOWA**

No. 25-0505
Filed July 23, 2025

**IN THE INTEREST OF C.G.,**
**Minor Child,**

**M.G., Mother,**
     Appellant.
_____

     Appeal from the Iowa District Court for Polk County, Brent Pattison, Judge.


     A mother appeals the adjudication of her sixteen-year-old daughter as a child in need of assistance.  **AFFIRMED.**


     Michael A. Horn of Horn Law Offices, Des Moines, for appellant mother.

     Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

     Nicole Garbis Nolan of Youth Law Center, Des Moines, attorney for minor child.

     Nancy Pietz, Des Moines, attorney and guardian ad litem for minor child.


     Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

A mother, Mary, challenges the juvenile court order adjudicating her sixteen-year-old daughter, C.G., as a child in need of assistance (CINA). She contends the State failed to offer clear and convincing evidence supporting the statutory grounds for adjudication. After carefully reviewing the record, we affirm.

## I.     Facts and Prior Proceedings

In June 2024, the Iowa Department of Health and Human Services received a report that Mary put C.G. in a headlock, punched her in the ear, and sat on her chest during an altercation. Based on that report, in early July the juvenile court ordered C.G.'s removal from Mary's custody and placed C.G. with her father. The State filed a petition alleging C.G. was a CINA under Iowa Code section 232.96A(2) and (3)(b) (2024).[1]

C.G. had a forensic interview at a child advocacy center later that month. She told the interviewer that on June 28 she was at home with her mother, her ten-year-old brother, and her infant son, who had an eye infection. According to C.G., she was in her bedroom trying to give medicine to her son when Mary intervened,

---

[1] In support of those grounds, the State asserted:
> [S]ince 2016 the [department] has assessed incidents regarding this family approximately twenty different times. Some of those incidents were drug related or involved incidents of physical abuse or neglect. The mother was named as the perpetrator in many of those physical abuse related incidents and it was recently alleged that she assaulted [C.G.]. . . . As a result, [C.G.] was safety planned with her father while the [department] and police continue to investigate the most recent incident. It should be noted [C.G.] is a new mother and has twice been court involved because of mental health related reasons . . . . According to the [department] though, [C.G.] has been following through with all court recommendations and attending therapy.

started yelling at her, and pushed her. C.G. left the room to get her phone and tried to leave the house through the front door. Mary followed and put her "in a chokehold." C.G. grabbed Mary's hair, and the pair fell to the ground. Then, according to C.G., Mary started "repeatedly punching" her in her right ear. When C.G. tried to get up, Mary sat on her chest. C.G. recalled that she "couldn't breathe." And she said that her brother "saw everything."

C.G.'s brother also had a forensic interview which corroborated much of his sister's account. He told the interviewer that he heard Mary and C.G. arguing in his sister's bedroom. Then, he saw C.G. grab her phone and try to leave the house, but Mary closed the door. At that point, C.G. and Mary "started fighting." He remembered C.G. pulling Mary's hair. He explained: "that's why mom punched her in the ear." He also remembered the two of them falling and C.G. "screaming I can't breathe repeatedly."

The CINA adjudication hearing took place over four days from October 2024 through January 2025. The State submitted video recordings of the children's forensic interviews as exhibits. The State also offered photos of bruising on C.G.'s right ear, along with an email from a nurse practitioner stating that this "type of injury to the ear would be consistent with blunt force trauma and would be consistent with a nonaccidental injury."

Mary testified that on June 28 she argued with C.G. after she tried to help "clean up" C.G.'s son. According to Mary, "[C.G.] pushed me" and "started screaming about how she was going to get me arrested again." Then, C.G. went to another room to get a phone "and tried to run out the door with it." As Mary recalled what happened next: "I went to redirect her back into the house when she

grabbed me by my hair and started fighting me." Mary acknowledged that she "was on top of" C.G. after they fell to the ground. She also agreed that it was possible C.G. was injured while they were "wrestling." But she denied punching or restraining C.G. And she insisted that C.G. was "the primary aggressor" in the fight.[2]

During closing arguments, C.G.'s attorney urged that "all the evidence before the court, with the exception of [the] mother's testimony, is that [C.G.] was physically assaulted by her mother. And we would ask the court to so adjudicate her."[3] She also read a statement C.G. wrote about her relationship with Mary and how the June 2024 incident impacted her:

> At this point, I'm done with putting up with this. All of my life I have been living in conditions that are very abusive and toxic. I'm tired of being treated like this. I'm tired of worrying about things I shouldn't have to worry about. I'm working on myself and being a good mom for my son. . . .
> . . . .
> I will never be able to look at you the same since you were sitting on top of me while I was screaming how I couldn't breathe. I don't call you Mom anymore, and I won't. Here's why: Because a mother would never do what you've done to their kid. Every single good or peaceful moment I will always hold close to my heart because it is the only time I can say you were my mom. . . .
> . . . .
> You've manipulated me, hit me, hurt me, and said things I will never forget. Thanks. I've been treated like I'm nothing for years and I won't let it happen to my son.

Mary resisted C.G.'s adjudication, insisting that "given all the testimony, she doesn't believe she was the aggressor in the situation. She was being attacked by [C.G.], who's had a history of mental health issues." In Mary's view, "she has

---

[2] Mary submitted photos of a bruise on her elbow and scratches on her wrist from the day of the incident.

[3] The guardian ad litem and C.G.'s father also supported adjudication.

a right to protect herself when she's being attacked and she used that right."

The juvenile court adjudicated C.G. as a CINA under both statutory grounds alleged in the State's petition, finding:

> There is really no question that Mary struck [C.G.] and that it caused some degree of physical injury. The combination of [her brother's] observations, [C.G.]'s reports, and Mary's acknowledgement that she prevented [C.G.] from leaving and then had a physical struggle with her add up to clear and convincing evidence that there was a nonaccidental physical injury.[4]

The court also found that Mary's testimony regarding the physical abuse was not credible, noting: "In her testimony, she was often evasive in her answers and focused her testimony on attacking [C.G.]'s character." Following a dispositional hearing, the court confirmed C.G. as a CINA and continued her placement with her father in March 2025.

Mary appealed the adjudication and dispositional orders.[5] We review her appeal de novo.[6] *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014).

## II. Analysis

Mary argues that the State failed to prove the statutory grounds for adjudication under Iowa Code section 232.96A(2) and (3)(b). She reiterates her claim that "C.G. was the aggressor in the incident and that [she] was acting in

---

[4] The court also adjudicated C.G.'s brother as a CINA under Iowa Code section 232.96A(3)(b). Mary does not appeal his adjudication.

[5] *See In re Long*, 313 N.W.2d 473, 477 (Iowa 1981) (finding that a pre-dispositional order for adjudication is not a final order appealable as a matter of right).

[6] "We review both the facts and the law, and we adjudicate rights anew." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) (cleaned up). We give weight to the juvenile court's findings of fact, especially when considering witness credibility, but we are not bound by them. *In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005). "As in all juvenile proceedings, our fundamental concern is the best interests of the child." *K.N.*, 625 N.W.2d at 733.

self[-]defense." And she contends that the "State failed to meet its burden in showing the injuries, if any, to C.G. were due to the actions of the mother."

The State bears the burden to prove the grounds for adjudication by clear and convincing evidence. *In re N.C.*, 952 N.W.2d 151, 153 (Iowa 2020); *see* Iowa Code § 232.96(2), (9). Evidence is clear and convincing "when there are no serious or substantial doubts as to the correctness of conclusions of law drawn from the evidence." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016) (cleaned up). We address the statutory grounds in turn because each ground may impact future proceedings. *See J.S.*, 846 N.W.2d at 41 ("The grounds for a CINA adjudication do matter.").

### A. Physical Abuse

The juvenile court may adjudicate a child under section 232.96A(2) if the child's parent "has physically abused or neglected the child, or is imminently likely to physically abuse or neglect the child." Physical abuse "means any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent." Iowa Code § 232.2(48).

Like the juvenile court, we find that the children's forensic interviews, plus Mary's admission to engaging in a physical fight with C.G. and the photos showing bruising on C.G.'s ear, "add up to clear and convincing evidence" that C.G. suffered a nonaccidental physical injury from Mary's actions. And contrary to Mary's assertions, her claim of self-defense does not justify the physical abuse of a child. Thus, adjudication was proper under section 232.96A(2).

### B. Failure to Exercise a Reasonable Degree of Care

The juvenile court may adjudicate a child under section 232.96A(3)(b) if the "child has suffered or is imminently likely to suffer harmful effects as a result of" the "failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child." Harmful effects are defined broadly and include "harm to a child's physical, mental, or social well-being." *J.S.*, 846 N.W.2d at 41–42.

The State offered clear and convincing evidence that Mary failed to exercise a reasonable degree of care in supervising C.G. By Mary's own admission, she engaged in a physical altercation with C.G., rather than letting C.G. leave to defuse the tense situation.[7] The State also offered a letter from C.G.'s mental health therapist regarding C.G.'s treatment progress and her strained relationship with Mary since then. That letter, coupled with C.G.'s statement read by her attorney at the adjudication hearing, demonstrates the harmful effects of Mary's actions on C.G.'s well-being.[8] Thus, adjudication was proper under section 232.96A(3)(b).

Finding ample evidence to support the juvenile court's adjudication order, we affirm.

**AFFIRMED.**

---

[7] When asked what she believed she did wrong that day, Mary answered: "I should have let [C.G.] run away again."

[8] As the juvenile court noted, "the main reasons for adjudication are related to the intense, recent conflict between Mary and [C.G.], Mary's inappropriate responses to it . . . , and the way all of this has impacted [C.G.]."