# IN THE COURT OF APPEALS OF IOWA

––––––––––––

No. 26-0072
Filed March 11, 2026

––––––––––––

**In the Interest of C.C., Minor Child,**

**T.D., Mother,**
Appellant.

––––––––––––

Appeal from the Iowa District Court for Cerro Gordo County,
The Honorable Adam D. Sauer, Judge.

––––––––––––

**AFFIRMED**

––––––––––––

Matthew B. De Jong, Rochester, Minnesota, attorney for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Jane Wright, Forest City, attorney and guardian ad litem for minor child.

––––––––––––

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

A mother appeals from a permanency order establishing a guardianship under Iowa Code section 232.104(2)(d)(2) (2025) for one child, C.C. (born 2009). She argues that the juvenile court should have granted her an additional six months to work toward reunification. After our de novo review, we affirm the ruling of the juvenile court.

## I. Background Facts and Proceedings.

Most recently, the Iowa Department of Health and Human Services (HHS) became involved with the family due to an incident at the mother's home.[1] In December 2024, the mother physically assaulted the child's older sibling, and the child intervened to pull the mother off the sibling.[2] A neighbor called law enforcement, and the mother was then charged with simple assault, arrested, and subsequently released. The HHS report noted that before the assault the mother had allegedly been intoxicated for three days.

The day after the incident, the mother "called law enforcement multiple times and told them to take her children." The child was removed the next day. The mother claimed that the child assaulted her, sent several text messages to a child protective worker that both children had been abusive towards her, and said HHS "could just take her children." The mother told the worker that she did not want her children returned. There was a founded child abuse report against the mother for failure to provide proper

---

[1] The child's father is deceased.

[2] The older sibling had an ongoing child-in-need-of-assistance (CINA) case and was returned to the mother's custody. When we use the term "child" we are referring only to C.C.

supervision and denial of critical care. The children reported that the mother is usually intoxicated or drinking alcohol when they are at home. After removal, the children were placed with their youth pastor's family. In January 2025, the child was adjudicated a CINA.

The child and his older sibling began having semi-supervised visits with the mother twice a week. The child often did not want to attend visits or, if he did attend, he did not participate. The mother would provide activities for the older sibling but not for the child. At a visit in February, the mother suggested guardianship for the child and that the older sibling could return to her care. Also, the mother sent alarming text messages to the child that upset him. Visits were eventually moved to fully supervised outside the home, in part due to the mother's "ongoing drinking and inappropriate behaviors" in front of the children.

In February, the mother served her time for the assault against the older sibling. That month's HHS report stated that the mother "continues to send very concerning text messages, mostly on the weekends, to HHS and [Family-Centered Services (FCS)]. HHS and FCS are concerned that she is intoxicated when texting. The messages are often long, rambling, and do not make sense."

In March, an HHS social worker arrived at the home with the children, and the mother was intoxicated with her paramour and refused to allow HHS and the children in the home, upsetting the children. The same social worker traveled to the home to complete a breathalyzer on the mother, but the mother called law enforcement claiming the social worker was trespassing.

In April, the HHS social worker noted that the mother

> ha[d] not made any significant progress in understanding how her alcoholism impacts her life, or the lives of her kids. She does not appear to have any intention of trying to become sober, and her behavior when she is intoxicated is unsafe for her children, despite them being older teens and having some protective capacities.

An ongoing concern throughout the case was the mother's paramour, who had physically assaulted the mother and been charged with and convicted of domestic violence. It was reported that he moved in with the mother in the spring. The paramour was not allowed to attend visits with the children. When the visits were still in the home, the FCS worker noticed his vehicle would leave and return before and after the visits. In July, when pressed why the paramour was still around, the mother explained that the paramour did not live with her, but she utilized him for transportation. The mother did not want a domestic violence advocate but wanted to continue processing her experiences in therapy. The child expressed that he did not want the mother's paramour in the home or to have any contact with him.

In July, the child moved placements to stay with his paternal aunt and uncle. They remain able and willing to have a guardianship established. Since then, the child has been doing well at school and with placement.

At more than one visit, the mother made negative comments toward the child. The August HHS report to the court documented that the child "has reported to all parties that he does not want to attend any visits and doesn't [want] to return to [the] mother's care." The report also noted that for the previous seven months of services the mother had been "very difficult to work with." The October FCS report noted no measurable progress because of the mother's failure to cooperate and her cancelling meetings. The December FCS report noted progress as the mother "has made changes

4

in her life, she is in therapy, attending treatment, AA meetings, [and] taking her medication."

The mother's alcohol and substance use throughout the case was an ongoing concern. The mother had several negative breathalyzer tests, but she missed eleven urinalysis tests, which HHS considered positive. In May and September, the mother tested positive for amphetamines.[3]

At a permanency hearing held in December, HHS recommended that a guardianship be established for the child with his paternal aunt and uncle with whom he had been living and had a strong bond. The mother requested an additional six months to work on her relationship with the child. An HHS social worker testified that for the "majority of the time [the mother] has been very difficult to work with" but at the time of the hearing the communication had improved. The mother had participated in services asked of her and was employed and attending individual therapy. The HHS social worker recommended that the child's sibling return home but not the child. The HHS social worker further explained that:

> [The child] wants permanency. He wants to move on. He wants to know that he's going to stay where he is. He had to switch schools, he's in wrestling. I don't think that it would be good to send him back to a place that he doesn't want to go at this age.

The HHS social worker felt like the child had thoughtfully considered this option. Likewise, the social worker also did not think the mom considered the child's needs but only her own. In considering the child's needs, the social worker testified about a concern that the mother would restrict the child's contact with the paternal family if returned to his mother's

---

[3] There was a reference that this test may have been related to a medication the mother was taking.

custody. To promote stability, the social worker expressed an additional six months would not serve what is best for the child. The choice of a guardianship offered stability for the rest of the child's high school years, thus, would be significantly better for the child.

To advocate for his position, the child, age sixteen, testified. His position was that he had no desire to return to his mother's custody and he found his current living situation to be a stable environment. Both with his schooling and his personal needs, the child opined he was doing well. The child had been removed from the mother's home for a year and had not participated in visits with the mother for over five months.

During the child's testimony, he shared instances when the mother was intoxicated and threatened to let the child's dog run away. And the mother was attempting to get rid of the child's dog on social media and would not allow the dog to be with the child in his placement. These occurrences caused the child to lose sleep and have stress. The child testified that the mother was causing unnecessary disruptions in his life by switching pharmacy pickups and medical appointments from where the child now resides to a town over thirty minutes away. The child testified that he loved his mother but would like her to agree to the guardianship.

Summarizing his thoughts, the child expressed the desire for a guardianship stating, "I want to move on in my life. I want to live life while I can before I get out of high school and become an adult. I don't want to continue this Court case for maybe the rest of high school." The child expressed concern that if returned to the mother she may cut him off from "the really bonded relationships with [his] aunt and uncle and the family that she cutoff [previously]."

The juvenile court did not grant the mother an additional six months of reunification services under Iowa Code section 232.104(d)(2). Instead, it transferred guardianship and custody of the child to the child's paternal aunt and uncle. The mother appeals.

## II. Standard of Review.

"We review CINA proceedings de novo." *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). "[W]e are not bound by the juvenile court's fact findings; however, we do give them weight." *Id.* As always, our primary concern is the best interests of the child. *Id.*

## III. Analysis.

On appeal, the mother claims that the juvenile court erred by not granting an additional six months for the family to work toward reunification. After a permanency hearing, the juvenile court may delay permanency and "continue placement of the child for an additional six months." Iowa Code § 232.104(2)(b). To grant additional time, the juvenile court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child . . . will no longer exist" after the six-month period. *Id.* Here, our review of the record reveals that the juvenile court did not err in finding that "it is not reasonable to believe the child can be safely returned home within six additional months of reunification services."

Noted throughout the ongoing CINA case was a finding that the mother and the child "do not have a healthy relationship with one another." At the time of the termination hearing the child was sixteen years old. During these proceedings the child attended therapy on his own and was taking his medications. He had established himself in a new school and was involved in

an extracurricular activity he enjoyed. During the permanency hearing, he described feeling stable living with the paternal aunt and uncle. These relatives consented to the guardianship. Prior to removal, the mother had created disruptions that impacted this child's sleep over threatening to let his pet run away. At more than one visit, the mother made negative comments toward the child. The child has been removed from the mother's custody for nearly a year and intentionally did not attend visitation for the last several months. The child has continually expressed that he does not want to return to his mother's custody and felt less stress in the current placement. By all accounts, the child is thriving in the home, while over the course of his life there had been instability and stress under his mother's custody.

The HHS report to the court for the December hearing noted that the mother "denies the need for or refuses" many of the recommended services and that the mother had blocked HHS "on all forms of communications." Additionally, the mother has continued to contact her paramour, around whom the child did not want to be.

On this record, we have no assurance that circumstances will be any different after a six-month extension and so we deny the mother's request for more time. The mother argues that "[t]here would be no harm in granting an additional six months to work towards reunification." In contrast, the HHS social worker noted that an additional six months would be "hurtful" to the child. "Children should not be forced to wait for their parent to be able to care for them, particularly when we have so little evidence to rely upon to believe the circumstances will be different in six months." *In re D.M.*, No. 21-1681, 2022 WL 951057, at *1 (Iowa Ct. App. Mar. 30, 2022) (citation omitted). While the older sibling returned to the mother's custody, we must focus on what placement will foster the best interests of C.C. Not all children

have the same needs or the same relationship with a parent. The juvenile court considered the specific needs of this child, as do we.

We are unable to conclude that the need for removal would no longer exist in six months. Given the child's age and the circumstances presented here, we find establishing a guardianship is in the best interests of the child.

**IV. Conclusion.**

Upon our de novo review, we cannot find that the need for removal would no longer exist in six months. Thus, we affirm the juvenile court's ruling.

**AFFIRMED.**